948 F.2d 536
 60 USLW 2327, 1991-2 Trade Cases P 69,624
 ALASKA AIRLINES, INC.; Midway Airlines; Muse Air
Corporation, Plaintiffs-Appellants,
v.
UNITED AIRLINES, INC., Defendant-Appellee.
ALASKA AIRLINES, INC, Plaintiff,
and
Northwest Airlines, Inc., Plaintiff-Appellant,
v.
UNITED AIRLINES, INC., Defendant,
and
American Airlines, Inc., Defendant-Appellee.
 Nos. 90-55162, 90-55163.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted April 5, 1991.
Decided Oct. 29, 1991.
 
 Maxwell M. Blecher, Blecher & Collins, Los Angeles, Cal., for plaintiffs-appellants.
 Roberts B. Owen, Covington & Burling, Washington, D.C., Robert E. Cooper, Gibson, Dunn & Crutcher, Los Angeles, Cal., for defendants-appellees.
 Appeal from the United States District Court for the Central District of California.
 Before NORRIS, HALL and TROTT, Circuit Judges.
 CYNTHIA HOLCOMB HALL, Circuit Judge:
 
 
 1
 Alaska Airlines, Muse Air Corporation, Midway Airlines, Inc., and Northwest Airlines, Inc. (collectively "plaintiffs") brought suit against their two largest competitors, United Airlines and American Airlines (collectively "defendants"), alleging that defendants had individually violated the Sherman Act in operating their proprietary computerized reservations systems ("CRS"). Plaintiffs appeal the district court's grant of summary judgment against them on two of their three distinct claims under Section 2 of the Act. 15 U.S.C. § 2. The district court had jurisdiction under 15 U.S.C. § 2 and 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1291. We affirm.
 
 
 2
 * In 1974, American Airlines obtained government approval to attempt to persuade the other major airlines to pool their resources and create a jointly-owned CRS. A CRS provides participating travel agents with schedule, fare, and seat availability information for every airline that subscribes to the CRS. Further, a CRS allows travel agents to send and receive airline booking data, book space on flights, and automatically prepare tickets and advance boarding passes. The proposed joint CRS project collapsed in 1976 due to insufficient funding. Three weeks later, United Airlines announced that it would create a proprietary CRS under the trade name of Apollo. American Airlines quickly responded by announcing that it would create its own proprietary CRS, under the trade name of SABRE. Other airlines also developed proprietary CRSs.[1] American's SABRE soon became the largest CRS. United's Apollo was the second largest.
 
 
 3
 Shortly after SABRE and Apollo began operations, Congress deregulated the airline industry. See The Airline Deregulation Act of 1978 ("the Deregulation Act"), Pub.L. No. 95-504, 92 Stat. 1705 (1978) (codified at 49 U.S.C.App. § 1301). Deregulation fueled demand for computerized fare and flight availability information, and as a result a substantial percentage of total air passenger bookings were made through CRSs.
 
 
 4
 The CRS works as follows. The airlines pass flight information to the CRSs, and the CRSs then provide this information to their subscribers, the travel agents. The travel agents in turn use the information to serve consumers, who naturally desire the lowest airfares and the most convenient flights. The CRSs charge travel agents only a nominal fee, or no fee, for the CRSs' services. In contrast, the CRSs charge airlines a substantial amount for such services, in the form of a per booking fee. For example, since the Civil Aeronautics Board ("the Board") ruled in 1984 that each CRS owner must charge its airline customers a uniform rate, American has charged a uniform fee of $1.75 for each booking made through SABRE.[2]
 
 
 5
 The CRS market's triangular structure makes the market unusually resistant to normal disciplinary mechanisms. A CRS's market share (the proportion of flights that are booked through a given CRS) might ordinarily be thought to depend on both how many travel agents and how many airlines subscribe to the CRS. However, because each and every airline subscribes to each and every viable CRS, the market share of a given CRS depends solely on the number of travel agents who subscribe to that CRS. Airlines generally subscribe to every CRS because the CRSs charge the airline per booking. The $1.75 fee to secure a booking is of little consequence because a $300 or $400 fare may otherwise be lost. This is not to say that a CRS can charge its airline subscribers any fee that it desires, no matter how high. Basic economic theory tells us that an airline will withdraw from the CRS if the cost of using it causes the marginal cost of providing a flight booked on the CRS to exceed the marginal revenue gained by the booking. See generally M. Handler, H. Blake, R. Pitofsky, H. Goldschmid, Trade Regulation App. B (2d ed. 1983) (hereinafter "Trade Regulation"). However, since CRS fees are a relatively small part of the total costs incurred by a "booked" airline when it provides air transportation to a paying passenger, the CRSs have leeway to charge substantial booking fees.
 
 
 6
 The plaintiffs, each previous subscribers to Apollo and SABRE, were unhappy about the ability of their largest competitors to extract substantial booking fees from them. Accordingly, plaintiffs brought suit under the Sherman Act.[3] Plaintiffs argued that United and American had individually violated Section 2 of the Sherman Act by, among other things: (1) denying plaintiffs reasonable access to their CRS services, which were alleged to be "essential facilities;" and (2) "leveraging" their dominance in the CRS market to gain a competitive advantage in the downstream air transportation market. The district court granted summary judgment in favor of defendants on both claims. Plaintiffs have appealed.[4]
 
 II
 
 7
 The district court's grant of summary judgment is reviewed de novo. Kruso v. Int'l. Tel. & Tel. Corp., 872 F.2d 1416, 1421 (9th Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 3217, 110 L.Ed.2d 664 (1990). We must decide, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant law. Tzung v. State Farm Fire and Casualty Co., 873 F.2d 1338, 1339-40 (9th Cir.1989).
 
 III
 A.
 
 8
 Defendants argue that the doctrine of res judicata bars plaintiffs from pursuing their essential facilities and monopoly leveraging claims in this court. "The concept of res judicata embraces two doctrines, claim preclusion and issue preclusion (or collateral estoppel), that bar, respectively, a subsequent action or the subsequent litigation of a particular issue because of the adjudication of a prior action." McClain v. Apodaca, 793 F.2d 1031, 1033 (9th Cir.1986). Defendants' claim is meritless because this is not a case where plaintiffs, unhappy with the outcome of one action, instituted an entirely separate action either alleging grounds for relief which could have been raised in the prior suit upon the same cause of action, or involving an issue previously litigated in the prior action. Rather, plaintiffs are merely appealing the district court's award of summary judgment in favor of defendants on two discreet issues alleged in the complaint. The doctrine of res judicata prohibits repetitive litigation, not appellate review of claims rejected by the district court. See McClain, 793 F.2d at 1032-33.
 
 B.
 
 9
 Defendants also contend that plaintiffs are judicially estopped from denying that collateral estoppel bars their essential facilities and monopoly leveraging claims. The doctrine of judicial estoppel precludes a party from arguing inconsistent positions to gain an unfair advantage over its adversary. See Russell v. Rolfs, 893 F.2d 1033, 1037-39 (9th Cir.1990) (state may not argue that appellant is procedurally barred from obtaining relief in state court when it had previously persuaded district court to deny appellate review because appellant had "adequate and available" state remedy), cert. denied, --- U.S. ----, 111 S.Ct. 2915, 115 L.Ed.2d 1078 (1991); Rockwell Int'l Corp. v. Hanford Atomic Metal Trades Council, 851 F.2d 1208, 1210 (9th Cir.1988).
 
 
 10
 Defendants' argument is without merit because plaintiffs' positions are not inconsistent. Prior to trial, defendants argued that plaintiffs did not have standing to assert unlawful monopolization of the market for CRS services to travel agents. In response to defendants' standing argument, plaintiffs asserted that defendants had monopoly power over travel agents and that defendants' monopoly power affected plaintiffs as consumers in that market.[5] Now, to support their monopoly leveraging and essential facility claims, on which the district prevented trial by granting summary judgment for defendants, plaintiffs say that defendants have monopoly power over plaintiffs, and that this factual question has not yet been determined. Plaintiffs' positions are not inconsistent because the argument that defendants had monopoly power over travel agents does not preclude the possibility that they might also have such power over airlines. Nor is it unfair for plaintiffs to press this argument on appeal because plaintiffs clearly made the argument below; this is not a case where a party creates a new theory to sustain its argument on appeal.
 
 IV
 
 11
 We turn to the merits of plaintiffs' antitrust claims. The antitrust laws are designed to "safeguard general competitive conditions, rather than to protect specific competitors." Oahu Gas Serv., Inc. v. Pacific Resources, Inc., 838 F.2d 360, 370 (9th Cir.1988).
 
 
 12
 * The Sherman Act provides in relevant part:
 
 
 13
 [Section 1.] Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.
 
 
 14
 [Section 2.] Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony....
 
 15 U.S.C. §§ 1, 2.[6]
 
 15
 The bare text of the Sherman Act indicates that Sections 1 and 2 focus on different problems. Section 1 deals with concerted activity, outlawing "combination[s] ... in restraint of trade." Id. Section 2, on the other hand, concerns unilateral activity, punishing "[e]very person who shall monopolize, or attempt to monopolize...." Id.
 
 
 16
 The Supreme Court described the differing functions of Sections 1 and 2 in Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984).[7] The Court emphasized that the Act distinguishes between unilateral and concerted conduct. While concerted conduct is subject to sanction if it merely restrains trade, unilateral conduct is subject to sanction only if it either actually monopolizes or threatens monopolization. The Copperweld Court said:
 
 
 17
 It is not enough that a single firm appears to "restrain trade" unreasonably, for even a vigorous competitor may leave that impression.... [B]ecause it is sometimes difficult to distinguish robust competition from conduct with long-run anticompetitive effects, Congress authorized Sherman Act scrutiny of single firms only when they pose a danger of monopolization. Judging unilateral conduct in this manner reduces the risk that the antitrust laws will dampen the competitive zeal of a single aggressive entrepreneur....
 
 
 18
 It cannot be denied that § 1's focus on concerted behavior leaves a "gap" in the Act's proscription against unreasonable restraints of trade. An unreasonable restraint of trade may be effected not only by two independent firms acting in concert; a single firm may restrain trade to precisely the same extent if it alone possesses the combined market power of those same two firms. Because the Sherman Act does not prohibit unreasonable restraints of trade as such--but only restraints effected by a contract, combination, or conspiracy--it leaves untouched a single firm's anticompetitive conduct (short of threatened monopolization) that may be indistinguishable in economic effect from the conduct of two firms subject to § 1 liability....
 
 
 19
 Moreover, whatever the wisdom of the distinction, the Act's plain language leaves no doubt that Congress made a purposeful choice to accord different treatment to unilateral and concerted conduct. Had Congress intended to outlaw unreasonable restraints of trade as such, § 1's requirement of a contract, combination, or conspiracy would be superfluous, as would the entirety of § 2.
 
 
 20
 Id. at 767-69, 774-77, 104 S.Ct. at 2739-41, 2743-45.
 
 
 21
 The instant case is predicated on Section 2.[8] We will review the two traditional grounds for relief under Section 2, monopolization and attempted monopolization, before moving on to consider plaintiffs' less orthodox claims. The traditional claim for monopolization has two elements: " '(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.' " Aspen Skiing Co. v. Aspen Highlands Skiing Co., 472 U.S. 585, 596 n. 19, 105 S.Ct. 2847, 2854 n. 19, 86 L.Ed.2d 467 (1985) (quoting United States v. Grinnell Corp., 384 U.S. 563, 570-71, 86 S.Ct. 1698, 1703-04, 16 L.Ed.2d 778 (1966)). The traditional claim for attempted monopolization arises when the danger of monopolization is clear and present, but before a full-blown monopolization has necessarily been accomplished. Accordingly, the elements of attempted monopolization, like the elements of monopolization, emphasize monopoly power and the acquisition or perpetuation of this power by illegitimate "predatory" practices. A claim for attempted monopolization has three elements: 1) a specific intent to monopolize a relevant market; 2) predatory or anticompetitive conduct; and 3) a dangerous probability of success. See Catlin v. Washington Energy Co., 791 F.2d 1343, 1348 (9th Cir.1986); Foremost Pro Color, Inc. v. Eastman Kodak Co., 703 F.2d 534, 543-44 (9th Cir.1983), cert. denied, 465 U.S. 1038, 104 S.Ct. 1315, 79 L.Ed.2d 712 (1984).
 
 B
 
 22
 Plaintiffs claim that United and American individually violated Section 2 of the Sherman Act by denying plaintiffs reasonable access to Apollo and SABRE. They base their claim on the "essential facilities" doctrine.[9] Stated most generally, the essential facilities doctrine imposes liability when one firm, which controls an essential facility, denies a second firm reasonable access to a product or service that the second firm must obtain in order to compete with the first. Plaintiffs propose a broad view of the essential facilities doctrine, claiming that defendants are liable under the doctrine even though defendants' control of their respective CRS systems did not give them power to eliminate competition in the downstream air transportation market. We must consider whether the essential facilities doctrine reaches that far.
 
 
 23
 In support of its broad view of the essential facilities doctrine, plaintiffs mistakenly rely on three Supreme Court cases: United States v. Griffith, 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236 (1948) (holding invalid concerted action by a number of movie distribution companies); Associated Press v. United States, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945) (ordering Associated Press, which had created a pooled news service, not to exclude prospective members merely because the prospective members competed with existing members); United States v. Terminal R.R. Ass'n, 224 U.S. 383, 397, 401, 411-12, 32 S.Ct. 507, 510, 512, 516, 56 L.Ed. 810 (1912) (holding that competitors had to be admitted into a combination formed by several railroads that had acquired control of all the passages into and out of St. Louis, passages which were not amenable to duplication). Griffith, Associated Press, and Terminal Railroad are of limited value because each case involved a combination in restraint of trade, not single firm conduct. Under the Sherman Act, combinations and individual firms are treated quite differently. See Copperweld, 467 U.S. at 767-69, 774-77, 104 S.Ct. at 2739-41, 2743-45 (while a combination may be liable for effecting a mere restraint of trade, for a single firm to be liable there generally must be either monopolization or the threat of monopolization). Moreover, as one commentator has noted:
 
 
 24
 [Associated Press ] cannot automatically govern unilateral denial of an essential facility for several reasons. First, and most obvious, concerted action is exceptional, whereas unilateral action is omnipresent. Innumerable firms engage in unilateral action every day. We have to be very wary about examining the decisions of each of those firms in our economy.... Second, concerted exclusion is much easier to remedy, particularly when an outsider, who is willing to invest on an equal basis, seeks admission at the time the joint venture is created.... Third, admission to a joint venture is a one-time remedy that does not require [the exertion of] day-to-day control [by the courts].
 
 
 25
 Areeda, Essential Facilities: An Epithet In Need of Limiting Principles, 58 Antitrust L.J. 841, 844-45 (1990) (emphasis added).
 
 
 26
 A review of the cases in which the doctrine has been applied to facilities controlled by single firms suggests that Section 2 does not prohibit the defendants' unilateral conduct. The sole Supreme Court case involving a single firm's control of an "essential facility" is Otter Tail Power Co. v. United States, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973). The Otter Tail Power Company's general practice was to supply both "wholesale" and "retail" electrical services in its operating area. However, a number of municipalities decided that they would prefer to supply the retail component of these electrical services themselves, and sought to contract with Otter Tail Power for only "wholesale" electrical services. Otter Tail Power, whose wholesale electrical services could not be duplicated feasibly, refused to supply only wholesale electricity, thereby eliminating the possibility of competition in the provision of "retail" electrical services. Id. at 369-71, 376-79, 93 S.Ct. at 1025-27, 1028-30.
 
 
 27
 Otter Tail, the foundation of the essential facilities doctrine in the single firm context, was an extreme case. Otter Tail Power, an "upstream" monopolist, baldly refused to deal with its potential "downstream" competitors. Given the difficulty of duplicating Otter Tail's facilities, this refusal did more than merely impose some handicap on potential competitors; it eliminated all possibility of competition in the downstream market. As the Supreme Court indicated, Otter Tail Power had both attempted to monopolize and had succeeded in monopolizing the downstream market for "retail" electric services. Id. at 377-79, 93 S.Ct. at 1029-30.
 
 
 28
 Two Seventh Circuit decisions suggest the limits of the essential facilities doctrine in the single firm context. In MCI Communications Co. v. AT & T, 708 F.2d 1081, 1133 (7th Cir.), cert. denied, 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983), the court held that AT & T violated Section 2 by refusing to connect MCI to its network. MCI, like Otter Tail, involved a refusal to grant access to a facility that could not be duplicated feasibly. Id. Moreover, this refusal eliminated competition, rather than merely impeding it. Thus, like Otter Tail Power, AT & T had the power to eliminate competition in a downstream market, exercised this power, and thereby monopolized the market.
 
 
 29
 In sharp contrast to MCI is Olympia Equipment Leasing v. Western Union Telephone Co., 797 F.2d 370 (7th Cir.1986), cert. denied, 480 U.S. 934, 107 S.Ct. 1574, 94 L.Ed.2d 765 (1987). Western Union, which had for years dominated the businesses of providing telex services and leasing telex machines, decided to quit the telex leasing business. Since the firm had a large stock of telex machines that it needed to dispose of, it converted its leasing agents into a sales force. Id. at 372-73. In an effort to help open the telex machine supply market to competition, Western Union instructed this newly formed sales force to pitch not only Western Union's telex machines, but also the machines of new entrants into the telex machine supply business. However, when the sales of Western Union's own telex machines did not meet expectations, the firm ordered its salespeople to stop mentioning the products of competing vendors. Id. Olympia, one of Western Union's rivals in the Telex machine supply business, brought suit under Section 2. Olympia claimed that Western Union's sales force was a facility "essential" to participation in the telex machine supply market, and asserted a right to nondiscriminatory access. Id. at 376-77.
 
 
 30
 The Seventh Circuit rejected Olympia's claim, holding that Olympia had no right of access to the trail that Western Union had already blazed. Even though Western Union's sizable sales force provided a considerable advantage and would require great effort to duplicate, Olympia must blaze its own trail to consumers. Judge Posner, for the court, stated: "Olympia had no right under antitrust law to take a free ride on its competitor's sales force. You cannot conscript your competitor's salesmen to sell your product even if the competitor has monopoly power and you are a struggling new entrant." Id. at 377-78.
 
 
 31
 Moreover, Western Union's sales force was not an "essential" facility because the sales force's withdrawal did not eliminate the potential for competition:
 
 
 32
 All Western Union did in this case to "obstruct" Olympia from competing with it in the sale or lease of telex terminal equipment was to stop making referrals to Olympia. That was not [sufficient] obstruction..., for Olympia remained free to compete by sending salesmen to call on Western Union's subscribers. This was not an illusory freedom. Firms better established than Olympia--firms that had their own sales forces--weathered the withdrawal of the vendor list.
 
 
 33
 Id. at 378-79.
 
 
 34
 The Second Circuit considered the reach of the essential facilities doctrine in Twin Laboratories, Inc. v. Weider Health & Fitness, 900 F.2d 566 (2d Cir.1990). In that case, the court affirmed the district court's grant of summary judgment in favor of Weider on the essential facilities claim. Id. at 569. Weider sold nutritional supplements and published the most widely read magazines catering to those interested in body building. Twin Labs competed with Weider in the market for nutritional supplements, and advertised its products in Weider's magazines. Weider then changed its policies and refused to include Twin Labs' advertisements in its magazines. Twin Labs sued, arguing that Weider's magazines amounted to an essential facility for competition in the nutritional supplement market, and that Weider's exclusion of Twin Labs therefore violated Section 2. Id. at 567-68.
 
 
 35
 The Second Circuit held that, as a matter of law, "Weider's conduct did not amount to an antitrust violation." Id. at 569. Twin Labs failed to demonstrate a "severe handicap" as a result of Weider's denial of access, a necessary element of a successful essential facilities claim. The opinion turns on the court's view that Weider's power to exclude advertising from its magazine did not amount to the power to eliminate competition in the downstream nutritional supplements market. Id. at 569-70. While Weider did have power to impose some handicap on his competition, this limited power was insufficient to establish that Weider's facility was "essential." The court said:
 
 
 36
 A successful "essential facilities" plaintiff must prove that denial of access has caused it "severe handicap."... Twinlab's own expert, Dr. Overstreet, stated that, six months after Weider's advertising ban, Twinlab's nutritional supplements were not only continuing to grow more profitable but were continuing to increase their market share relative to Weider's products. While Dr. Overstreet stated that in his opinion Twinlab's growth would have been even more rapid but for the advertising ban, this hardly constitutes a showing of severe hardship....
 
 
 37
 [A]s the word "essential" indicates, a plaintiff must show more than inconvenience, or even some economic loss; he must show that an alternative to the facility is not feasible.
 
 Id. at 569-70 (citations omitted).[10]
 
 38
 Weider, Olympia, and MCI share a concern that transcends their fact-based differences. A facility that is controlled by a single firm will be considered "essential" only if control of the facility carries with it the power to eliminate competition in the downstream market.[11]
 
 
 39
 In the instant case, it is clear that defendants' control of their CRSs did not give them power to eliminate competition in the downstream air transportation market.[12] Basic economic theory tells us that plaintiffs will withdraw from SABRE or Apollo if the cost of using either CRS causes the cost to the airline of providing a flight booked on a CRS to exceed the revenue that the airline gains by providing the flight. See Trade Regulation App. B; E. Sullivan & J. Harrison, Understanding Antitrust and its Economic Implications 22 (1988). It is difficult to imagine that a travel agent would subscribe to a CRS if it only contained information about 12-14% of available flights. Because the parties agree that neither United nor American controlled more than 12-14% of the air transportation market, SABRE and Apollo would contain information concerning approximately 12-14% of available flights if competitors withdrew from either SABRE or Apollo. Thus, the ability of United or American to abuse their downstream competitors by manipulating their CRSs is severely limited.
 
 
 40
 Moreover, United and American have never refused any of the plaintiffs access to their respective CRSs.[13] See Otter Tail, 410 U.S. at 378, 93 S.Ct. at 1030 (outright refusal); MCI, 708 F.2d at 1132 (same). Rather, United and American have always given all of their competitors in the air transportation market such access for a fee. Neither United nor American have ever set this fee at a level that would drive their competitors away. As noted above, it is unlikely that defendants would set their fee at such a level, for if they did, they would destroy their CRSs rather than their competition.
 
 
 41
 Plaintiffs claim that each defendant's CRS was an "essential" facility because each defendant's control of its CRS gave it power to redistribute a portion of its rivals' revenues to itself. Plaintiffs make this claim even though they concede that each defendant's control of its CRS did not create a dangerous probability of monopolization in the downstream air transportation market. Although each defendant may have gained some leverage over its competitors through control of its CRS, each defendant's power fell far short of the power to eliminate competition seen in Otter Tail and MCI. At most, defendants gained a monetary profit at their rivals' expense. The exercise of this limited power is not actionable under Section 2.[14]
 
 
 42
 Our view of the essential facilities doctrine does not render the doctrine superfluous or otherwise inappropriately curtail its reach. When a firm's power to exclude rivals from a facility gives the firm the power to eliminate competition in a market downstream from the facility, and the firm excludes at least some of its competitors, the danger that the firm will monopolize the downstream market is clear. In this circumstance, a finding of monopolization, or at least attempted monopolization, is appropriate, and there is little need to engage in the usual lengthy analysis of factors such as intent. Cf. Catlin, 791 F.2d at 1348 (specifying the elements of a claim for attempted monopolization). We hold that neither defendant denied plaintiffs an "essential" facility in violation of the antitrust laws.
 
 C
 
 43
 Plaintiffs next allege that each defendant violated Section 2 by "leveraging" its monopoly power over its competitors in the CRS market to gain a competitive advantage over these airlines in the downstream air transportation market.[15] Plaintiffs admit that, because there was no dangerous probability that either defendant would monopolize the downstream air transportation market, they have no claim under the traditional Section 2 doctrine of attempted monopolization. This circuit expressly declined to decide whether "monopoly leveraging is a distinct Section 2 violation" in Catlin v. Washington Energy Co., 791 F.2d 1343, 1348 (9th Cir.1986).
 
 
 44
 The origin of the notion that a single firm may be liable for "monopoly leveraging," even in the absence of a threat that the "leveraged" market will be monopolized, is Berkey Photo, Inc. v. Eastman Kodak Co., 603 F.2d 263 (2d Cir.1979), cert. denied, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980). In Berkey Photo, Kodak possessed a monopoly in the film and camera markets. Berkey Photo argued that Kodak had "leveraged" its dominant position in these areas to gain a "competitive advantage" in the photofinishing equipment and services markets. Berkey Photo conceded that there was no dangerous probability that Kodak could monopolize either of these markets. Id. at 275.
 
 
 45
 The Berkey Photo court announced and applied the rule that "a firm violates § 2 by using its monopoly power in one market to gain a competitive advantage in another, albeit without an attempt to monopolize the second market." Id. In contrast to the traditional actions for monopoly and attempted monopoly, Berkey Photo's "monopoly leveraging" doctrine has only two rather loose elements: 1) there must be monopoly power in some market, and 2) such power must be "exercise[d] ... to the detriment of competition" in another market. The Berkey Photo court slighted the functions performed by the elements of the traditional Section 2 offenses, stating: "There is no reason to allow the exercise of [monopoly] power to the detriment of competition, in either the controlled market or any other. That the competition in the leveraged market may not be destroyed but merely distorted does not make it more palatable." Id. at 275.
 
 
 46
 We now reject Berkey's monopoly leveraging doctrine as an independent theory of liability under Section 2. Even in the two-market situation, a plaintiff cannot establish a violation of Section 2 without proving that the defendant used its monopoly power in one market to obtain, or attempt to attain, a monopoly in the downstream, or leveraged, market. We believe that Berkey Photo misapplied the elements of Section 2 by concluding that a firm violates Section 2 merely by obtaining a competitive advantage in the second market, even in the absence of an attempt to monopolize the leveraged market.[16]
 
 
 47
 As traditionally interpreted, the Sherman Act punishes any individual or entity that uses "predatory" means to attain a monopoly, or to perpetuate a monopoly after the competitive superiority that originally gave rise to the monopoly has faded. See Aspen Skiing Co., 472 U.S. at 602, 610-11, 105 S.Ct. at 2857, 2861-62 (upholding liability of a monopolist that had used predatory conduct to attain or preserve monopoly power); Grinnell Corp., 384 U.S. at 570-71, 86 S.Ct. at 1703-04. A monopoly attained or perpetuated by such means unnecessarily raises the cost of the relevant product or service, with the ultimate victim being the consumer. See United States v. Syufy Enterprises, 903 F.2d 659, 663 (9th Cir.1990); United States v. Aluminum Co. of Am., 148 F.2d 416, 427 (2d Cir.1945).
 
 
 48
 However, the Sherman Act does not attack every monopoly. See Aspen Skiing Co., 472 U.S. at 602, 105 S.Ct. at 2857 (holding that predatory conduct to attain or preserve a monopoly is a prerequisite to a finding of monopolization or attempted monopolization); Syufy Enterprises, 903 F.2d at 668 (stating that "[w]hile the successful competitor should not be raised above the law, neither should he be held down by law"); Olympia, 797 F.2d at 375-76 ("[T]he lawful monopolist should be free to compete like everyone else; otherwise the antitrust laws would be holding an umbrella over inefficient competitors."); Foremost, 703 F.2d at 543-44 ("[T]he Sherman Act ... does not render unlawful all monopolies.... A monopolist, no less than any other competitor, is permitted and indeed encouraged to compete aggressively on the merits."). A firm may acquire a monopoly simply by virtue of being a better competitor. For example, a firm may have better production methods or be more innovative than its past and prospective competitors. Aspen Skiing Co., 472 U.S. at 604, 105 S.Ct. at 2858; Grinnell Corp., 384 U.S. at 570-71, 86 S.Ct. at 1703-04; Syufy Enterprises, 903 F.2d at 668; Aluminum Co. of Am., 148 F.2d at 430. This kind of monopoly, absent "predatory" practices to maintain it, will continue only so long as the monopolist sustains a level of efficiency or innovation such that its rivals cannot effectively compete. Because this type of monopolist behaves in an economically efficient manner, the antitrust laws do not stand as an obstacle to its existence. See Syufy Enterprises, 903 F.2d at 668; Olympia, 797 F.2d at 375-76; Foremost, 703 F.2d at 544; see also P. Areeda & D. Turner, Antitrust Law, at 41-42, 60-63, 68-71 (1978).
 
 
 49
 There is also at least one other type of lawful monopoly--the natural monopoly. Such a monopoly occurs when:
 
 
 50
 There may not be room enough in the market for more than one firm.... In that case, demand is "too thin" to support two surviving firms. Monopoly is inevitable.... [For example, t]he entire natural gas consumption of a region of the country may be insufficient to support a second pipeline from a remote producing region. Demand may total millions of dollars annually and yet be "too thin" relative to the minimum efficient scale of a long-distance natural gas pipeline, a hydroelectric power generator, or a fully automated machine-tool production line. In these cases, demand m[ight] be sufficient at some price fixed by law ..., but the cost of production will be significantly lower with a single producer. In that event, one producer can earn larger profits by charging less [than a number of producers of inefficient scale would be able to charge] in order to win a larger volume of business that will permit him to produce at lower unit costs. Local public utilities supplying electricity, gas, water, and telephone service are usually regarded as classic examples....
 
 
 51
 P. Areeda & D. Turner, supra, at 47-48.
 
 
 52
 The antitrust laws tolerate both efficient monopolies and natural monopolies. See Foremost, 703 F.2d at 543. The Sherman Act has not been interpreted to penalize efficient monopolies because they meet consumer demand without raising the price and gaining a monopoly profit. Syufy Enterprises, 903 F.2d at 668; see also Berkey, 603 F.2d at 294. The Sherman Act also has not been interpreted to penalize natural monopolies. A firm that creates a valued service or product should not be punished with treble damages and criminal sanctions merely because the firm finds itself to be the holder of a natural monopoly. Aluminum Co. of Am., 148 F.2d at 429-30 (reasoning that those who find themselves holders of a natural monopoly should not be subject to Sherman Act sanctions). Government regulation, as opposed to treble damages and criminal liability under the Sherman Act, is generally thought to be the appropriate remedy for the difficulties posed by natural monopolies. See Jones, Government Price Controls and Inflation: A Prognosis Based on the Impact of Controls in the Regulated Industries, 65 Cornell L.Rev. 303, 304 (1980). "[J]udicial oversight of pricing policies would place the courts in a role akin to that of a public regulatory commission. We would be wise to decline that function unless Congress clearly bestows it upon us." Berkey Photo, 603 F.2d at 294 (citations omitted); see also Areeda, supra, at 845, 853.
 
 
 53
 Thus, the elements of the established actions for "monopolization" and "attempted monopolization" are vital to differentiate between efficient and natural monopolies on the one hand, and unlawful monopolies on the other. Berkey Photo's monopoly leveraging doctrine fails to differentiate properly among monopolies. The anticompetitive dangers that implicate the Sherman Act are not present when a monopolist has a lawful monopoly in one market and uses its power to gain a competitive advantage in the second market. By definition, the monopolist has failed to gain, or attempt to gain, a monopoly in the second market. Thus, such activity fails to meet the second element necessary to establish a violation of Section 2. Unless the monopolist uses its power in the first market to acquire and maintain a monopoly in the second market, or to attempt to do so, there is no Section 2 violation.
 
 
 54
 Monopoly leveraging is just one of a number of ways that a monopolist can permissibly benefit from its position. See Berkey Photo, 603 F.2d at 294; P. Areeda & D. Turner, supra, at 41-42; Trade Regulation App. B; E. Sullivan & J. Harrison, supra, at 19-27. This does not mean, however, that such conduct is anticompetitive. Both "monopoly leveraging" in an adjacent market, and setting high prices in the original "monopoly" market, represent the cost that we incur when we permit efficient and natural monopolies.[17] See Berkey Photo, 603 F.2d at 294 ("setting a high price may be a use of monopoly power, but it is not in itself anticompetitive"). The Supreme Court has consistently held that there must be "predatory" conduct to attain or perpetuate a monopoly for a monopolist to be liable under Section 2. Aspen Skiing Co., 472 U.S. at 596 n. 19, 602, 105 S.Ct. at 2854 n. 19, 2857; Grinnell Corp., 384 U.S. at 570-71, 86 S.Ct. at 1703-04; see also Syufy Enterprises, 903 F.2d at 669 ("[f]ostering an environment where businesses fight it out using the weapon of efficiency and consumer goodwill is what the antitrust laws are meant to champion."). We hesitate to disregard this settled rule in the absence of any meaningful substantive distinction between monopoly leveraging and other consequences of lawful monopoly.
 
 
 55
 The danger that a lawful monopoly will either create a new monopoly or unduly perpetuate itself is no more evident when a lawful monopoly is leveraged than when a lawful monopolist reaps its monopoly profit solely from price increases in the monopoly market. Indeed, leveraging activity may tend to undermine monopoly power, just like monopoly pricing. Every time the monopolist asserts its market dominance on a firm in the leveraged market, the leveraged firm has more incentive to find an alternative supplier, which in turn gives alternate suppliers more reason to think that they can compete with the monopolist. Every act exploiting monopoly power to the disadvantage of the monopoly's customers hastens the monopoly's end by making the potential competition more attractive. P. Areeda & D. Turner, supra, at 41-42; see also Berkey Photo, 603 F.2d at 294 (applying this principle to monopoly pricing).
 
 
 56
 Berkey Photo errs by straying from the Sherman Act's focus on the problem of the creation, or attempted creation, of a monopoly through monopoly leveraging. The antitrust laws seek to punish only the willful attainment and maintenance of a monopoly, or the attempt to attain such a monopoly. If there is a dangerous probability that a monopoly will be created by leveraging conduct, then the conduct will be reached under the doctrine of attempted monopoly.
 
 V
 
 57
 We conclude that defendants' CRSs were not essential facilities, and we reject Berkey Photo's monopoly leveraging doctrine.
 
 
 58
 The judgment of the district court is AFFIRMED.
 
 
 
 [1]
 TWA began operating a CRS in 1976. Eastern Airlines and Delta Airlines began operating CRSs in 1981
 
 
 [2]
 The Deregulation Act eliminated both the Board itself and many of its functions. See 49 U.S.C.App. § 1551. Most of the Board's remaining functions were transferred to the Department of Transportation. See id. at § 1551(a)(1)(E). The CRS fee regulation remains in effect. See 14 C.F.R. § 255.5(a)
 
 
 [3]
 At the conclusion of pretrial proceedings in September 1989, two separate CRS cases were ready for trial: (1) a suit by Northwest Airlines against American Airlines, and (2) a suit by Alaska Airlines, Midway Airlines, and Muse Air Corporation (now part of Southwest Airlines) against United Airlines. The district court consolidated these cases and tried both of them simultaneously, a decision that has not been appealed
 
 
 [4]
 Plaintiffs also asserted a third Section 2 claim, arguing that each defendant had unlawfully acquired and then exercised monopoly power over travel agents in the market for CRS services. This third claim was tried by a jury, which returned a verdict in favor of each defendant. Plaintiffs do not appeal these jury verdicts
 
 
 [5]
 Defendants contend that, in response to the standing challenge, plaintiffs defined the relevant market as CRS services to both travel agents and airlines. Defendants are incorrect. Plaintiffs argued that the market was identical to the one approved by the district court in its summary judgment opinion, In re Air Passenger Computer Reservations Systems Antitrust Litigation, 694 F.Supp. 1443 (1988). While the court in that opinion does use loose language suggesting that the relevant market consists of CRS services to both travel agents and airlines, in its decision on the standing motion, the district court explained that, in its summary judgment opinion, "[it] undertook to analyze the relevant markets to CRS services to travel agents and found that the plaintiff airlines were consumers in that market for the purpose of establishing a Section 2 monopolization claim." Thus, even if plaintiffs alleged that the market included services to both airlines and travel agents, it is obvious that the district court did not base its decision on this allegation
 
 
 [6]
 Private treble damage actions for violations of the Sherman Act are authorized by Sections 4 and 5(a) of the Clayton Act. 15 U.S.C. §§ 15, 16
 
 
 [7]
 In Copperweld the Court considered the validity of the "intra-enterprise conspiracy" doctrine. The Court faced the question whether a wholly-owned subsidiary corporation and its parent corporation could "conspire" with each other for purposes of Section 1 of the Sherman Act. Copperweld, 467 U.S. at 767, 104 S.Ct. at 2739. It is apparent from the Copperweld opinion that the Court relied heavily on its analysis of the relationship between sections 1 and 2 of the Act in concluding that a wholly owned subsidiary cannot "conspire" with its parent. See id. at 767-69, 774-77, 104 S.Ct. at 2739-41, 2743-45
 
 
 [8]
 Plaintiffs based their claims against defendants on Section 2 of the Sherman Act in the district court, in their opening brief, and at oral argument. Thus, we do not consider the viability of any claims that plaintiffs might have had under Section 1 of the Act. See United States v. Munoz, 746 F.2d 1389, 1390 (9th Cir.1984) (refusing to consider a tort theory not raised below in a contract action)
 
 
 [9]
 We considered the essential facilities doctrine only very briefly in Ferguson v. Greater Pocatello Chamber of Commerce Inc., 848 F.2d 976, 983 (9th Cir.1988), before concluding it was inapplicable on the facts before us
 
 
 [10]
 As the Weider court noted, some commentators have suggested that the essential facilities doctrine be applied only to facilities that are " 'natural monopol[ies], facilities whose duplication is forbidden by law, and perhaps those that are publicly subsidized and thus could not practicably be built privately.' " Id. at 569 (quoting P. Areeda & H. Hovenkamp, Antitrust Law p 736.2 at 680-81 (1988 Supp.)). The reason for such a limitation is that control of a natural monopoly facility gives the facility holder a power to eliminate downstream competition that is permanent even in theory, as well as in practice. See 3 P. Areeda & D. Turner, Antitrust Law 47-48 (1978). Such a strict limitation goes further than Weider, and perhaps Olympia
 
 
 [11]
 The cases also seem to contemplate a second condition that must be satisfied for a facility to be considered "essential" in addition to the power to eliminate competition: The power to eliminate competition must not be momentary, but must be at least relatively permanent. See MCI, 708 F.2d at 1133 (discussing virtual impossibility of duplicating AT & T's local distribution facilities); Olympia, 797 F.2d at 379 (discussing possibility that Olympia "remained free to compete by sending salesmen to call on Western Union's subscribers."). In the instant case we need not decide whether defendants' control of their respective CRSs gave them power that was of sufficient permanence for the CRSs to qualify as essential facilities. For we conclude that the extent of the power bestowed on defendants by Apollo and SABRE, quite apart from the duration of this power, was insufficient
 
 
 [12]
 Monopoly control of the upstream market is a necessary element of essential facility and monopoly leveraging claims. Defendants contend that plaintiffs' claims fail as a matter of law because the jury has decided that defendants do not have monopoly control in the upstream CRS market
 However, the jury did not directly consider whether defendants had monopoly power in the CRS market for services to airlines. The jury was specifically instructed to consider only whether defendants possessed monopoly power over the travel agent participants in the CRS market. Since jurors are presumed to follow the instructions given, see United States v. Escalante, 637 F.2d 1197, 1202 (9th Cir.), cert. denied, 449 U.S. 856, 101 S.Ct. 154, 66 L.Ed.2d 71 (1980), we reject defendants' contention that the jury directly considered the extent of defendants' monopoly power over plaintiffs.
 Neither did the jury implicitly decide that defendants lacked monopoly power over plaintiffs. See In re Westgate-Cal. Corp., 642 F.2d 1174, 1176 (9th Cir.1981) (holding that collateral estoppel barred plaintiff's claim because the jury's previous decision that plaintiff had engaged in fraud effectively resolved the newly presented question whether plaintiff had acted inequitably). Plaintiffs and the travel agent participants in the CRS market are not similarly situated. Plaintiffs alleged that they had no real alternative to membership in either SABRE or Apollo because withdrawal would result in a business loss of such magnitude that no member airline could withstand it. In contrast, aside from contractual limitations, travel agents can switch CRSs whenever they desire. A travel agent must belong to only one CRS to obtain the information that she needs to operate her business, and there are a number of CRSs to which the travel agent may subscribe. This factual difference indicates that the jury's decision could not have included a finding that the defendants had monopoly power over plaintiffs.
 
 
 [13]
 We do not reach the question of whether at some level, charging a price may be the same as an outright refusal to deal
 
 
 [14]
 We highlight that this is not a case in which a facility holder has the power to eliminate competition in a downstream market, but has as yet exercised its power to only a limited extent. The essential facilities doctrine, consistent with principles underlying section 2, might well reach such conduct, because in that situation, the danger of monopolization may be immediate enough to satisfy the Act
 
 
 [15]
 Defendants claim that plaintiffs waived their monopoly leveraging claim by failing to raise the claim in the district court. It is well established that an appellate court will not reverse a district court on the basis of a theory that was not raised below. See Image Technical Service, Inc. v. Eastman Kodak, 903 F.2d 612, 615 n. 1 (9th Cir.1990) (holding that plaintiff's failure to raise an issue in opposition to a defendant's motion for summary judgment waived the issue), cert. granted, --- U.S. ----, 111 S.Ct. 2823, 115 L.Ed.2d 994 (1991); Munoz, 746 F.2d at 1390 (refusing to consider a tort theory not raised in contract action below). However, there is no factual basis supporting defendants' contention. First, plaintiffs raised the monopoly leveraging claim at the outset of their action. Second, although plaintiffs emphasized the essential facilities theory in their response to defendants' motion for summary judgment, they also discussed Griffith, a monopoly leveraging case, and mentioned the monopoly leveraging doctrine. Most importantly, the district court discussed the theory at length. See In Re Air Passenger Computer Reservation System Antitrust Litigation, 694 F.Supp. at 1472-75. Thus, we reject defendants' waiver argument
 
 
 [16]
 Plaintiffs also rely on two other cases, neither of which need be addressed at length. First, although United States v. Griffith, 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236 (1948), does contain some broad language, it is not controlling since it is a Section 1 case involving concerted action. See Copperweld, 467 U.S. at 774-77, 104 S.Ct. at 2743-45 (noting the difference between Section 1's focus on concerted activity and Section 2's focus on unilateral activity)
 Plaintiffs also cite Kerasotes Mich. Theatres, Inc. v. National Amusements, Inc., 854 F.2d 135 (6th Cir.1988), cert. dismissed sub nom., G.K.C. Mich. Theatres, Inc. v. National Amusements, Inc., 490 U.S. 1087, 109 S.Ct. 2461, 104 L.Ed.2d 982 (1989). In Kerasotes, the Sixth Circuit held that the use of monopoly power in one market to gain a competitive advantage in a second market is forbidden, even when there is no danger of monopolization in the second market. Id. at 137-38. Kerasotes is in error for the same reasons that Berkey Photo is in error.
 
 
 [17]
 We highlight that this case does not involve the special problem of a regulated monopolist (usually a natural monopolist) that seeks to evade regulations which limit profits in the monopoly market by creeping into adjacent, unregulated markets. Such a case might present very different issues