**PPG INDUSTRIES, INC., a Pennsylvania corporation, Plaintiff,**

**v.**

**PILKINGTON PLC, an English corporation; Libbey–Owens–Ford Co., a Delaware corporation, Defendants.**

**No. CIV 92–753–TUC–WDB.**

United States District Court,
D. Arizona.

July 9, 1993.

---

Lawrence G.D. Scarborough, Jack E. Brown, Brown & Bain, P.A., Phoenix, AZ, and Thomas Barr, and Paul Michael Dodyk, Cravath Swaine & Moore, New York City, for plaintiff.

Jack Kaufmann, Dewey Ballantine, New York City, Donald C. Klawiter, Robert Schlossberg, John H. Shenefield, Morgan, Lewis & Bockius, Washington, DC, and David Alwin Paige, Snell & Wilmer, Tucson, AZ, for defendants.

## ORDER

WILLIAM D. BROWNING, Chief Judge.

Pending before the Court are: (1) the December 18, 1992 Motion of Defendant Pilkington plc ("Pilkington") to Dismiss Counts Four and Five; and (2) Pilkington's December 18, 1992 Motion to Stay Proceedings and Compel Arbitration or Dismiss.

## ORDER AND OPINION

### I. *Factual and Procedural Background*

Plaintiff, PPG Industries, Inc. ("PPG"), has filed a Complaint alleging antitrust violations by Defendants Pilkington and Libbey–Owens–Ford Company ("LOF"). The allegations describe "a wheel-like scheme in which Pilkington operates at the hub to monopolize the markets for float process technology and for flat glass." PPG's November 4, 1992 Memorandum in Support of its Application for Temporary Restraining Order, at 2. *See* Complaint ¶ 20.

In the late 1950s, Pilkington developed and patented the first commercially successful float process for manufacturing flat glass. In 1962, it licensed its technology to PPG among others. Plaintiff states that "Pilkington operates or has licensed more than ninety-five percent of the existing float glass manufacturing plants worldwide." *Id.* at 3. Pilkington states that it has entered into more than 50 separate agreements under which 150 float glass manufacturing plants operate in some 35 countries.

In the middle 1970s, PPG patented another float process technology known as the "LB process." Subsequently, PPG and Pilkington have had a number of disputes concerning PPG's efforts to license, develop, construct, and operate float glass manufacturing plants using the LB process. Pilkington has maintained that the LB process was derivative of its technology and, thus, fell under its 1962 licensing agreement with PPG. Thus, Pilkington has sought to prevent PPG from licensing its LB process except as authorized by Pilkington by initiating the arbitration of its claims.[1]

In the middle 1980s, the most recent dispute arose. PPG attempted to participate in the construction and operation of a float glass manufacturing plant based on the LB process in the People's Republic of China. In 1985, Pilkington again responded by initiating arbitration proceedings in London. In July or August 1992, the arbitrators issued their decision. According to PPG, they found that most of the float process technology items claimed as confidential by Pilkington were public knowledge,[2] and that PPG would have developed its LB process, without using Pilkington's technology, by the time PPG attempted to participate in the Chinese venture. Nonetheless, the arbitrators awarded Pilkington with a "notional" royalty on PPG's use of the LB process in China.

### II. *Defendants' Motion to Dismiss Counts Four and Five*

#### A. Pilkington's Argument

Count Four of PPG's Complaint is a monopolization claim. Count Five is an attempted monopolization claim. Pilkington argues that PPG's allegations supporting each count are defective and do not state a claim for relief under Section 2 of the Sherman Act. 15 U.S.C. § 2 (1988).

One of the essential elements of a Section 2 monopolization claim is the existence of monopoly power in the relevant market. According to Pilkington, "[t]o state a claim for monopolization (Count Four), PPG must allege, *inter alia,* facts that, if true, establish that Pilkington currently possesses monopoly power in the production and sale of flat glass." Motion, at 2 (citing *Oahu Gas Serv., Inc. v. Pacific Resources Inc.,* 838 F.2d 360, 363 (9th Cir.), *cert. denied,* 488 U.S. 870, 109 S.Ct. 180, 102 L.Ed.2d 149 (1988)).

---

1. The 1962 license imposes an irrevocable, royalty-free grant-back license, which permits Pilkington to use or sub-license any technological improvements developed by the licensee, and requires that all disputes arising under the license to be arbitrated in London under English law.

2. PPG concedes that the arbitrators also found that some of the items were covered by the 1962 license.

One of the essential elements of a Section 2 attempted monopolization claim is the existence of a dangerous probability of monopolization. *Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*, 924 F.2d 1484, 1491 n. 8 (9th Cir.1991) (citing *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 811 (9th Cir.1988)). Thus, Pilkington argues that, "[t]o state a claim for attempted monopolization (Count Five), PPG must allege, *inter alia*, facts that, if true, establish the presence of a dangerous probability of monopolization by Pilkington." Motion, at 2.

Pilkington notes that courts may not condemn unilateral conduct, such as that which PPG targets in Counts Four and Five, absent the existence or impending threat of monopoly power. *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 767–68, 104 S.Ct. 2731, 2739–40, 81 L.Ed.2d 628 (1984); *Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 541 (9th Cir.1991), *cert. denied*, — U.S. —, 112 S.Ct. 1603, 118 L.Ed.2d 316 (1992).

According to Pilkington, "PPG's only cognizable factual allegation relating to Pilkington's 'monopoly power' in the production and sale of flat glass is that Pilkington enjoys an 'approximately 20 percent' share of a 'worldwide' market for flat glass." Motion, at 3 (citing PPG's Complaint ¶¶ 1, 10). Pilkington asserts, in a footnote, that PPG's attempt to "preserve" claims of monopolization in smaller geographic markets fails because PPG did not allege facts supporting monopoly power in these markets. *Id.* at 3 n. 2. Thus, it argues that a 20 percent share of the world market "is insufficient, as a matter of law, to support PPG's claims either of monopolization or attempted monopolization under Section 2 of the Sherman Act." *Id.* at 3.

Pilkington states that, "[i]n order to survive a motion to dismiss a monopolization claim when the only relevant fact that plaintiff has alleged is a specific market share, the alleged market share must be 'at least above some level ... [such that] an inference [of monopoly power] is not implausible on its face.' "[3] Id. at 6 (quoting *Hunt–Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 925 (9th Cir.1980), *cert. denied*, 450 U.S. 921, 101 S.Ct. 1369, 67 L.Ed.2d 348 (1981)). Pilkington then contrasts PPG's allegation that Pilkington has a 20 percent world market share with Ragu's 65 percent share found to be sufficient to state a claim in *Hunt–Wesson*. Pilkington asserts that an allegation of a 20 percent share is "implausible on its face" and, thus, that PPG's allegation is not "sufficient, as a matter of pleading, to withstand a motion for dismissal." *Id.*

As support for its attack on Count Four, Pilkington cites a "legion" of cases supporting the proposition that, as a matter of law, a market share of 20 percent is insufficient to support a monopolization claim. *See United Air Lines, Inc. v. Austin Travel Corp.*, 867 F.2d 737, 742 (2nd Cir.1989) (appeal of summary judgment); *Dimmitt Agri Indus., Inc. v. CPC Int'l, Inc.*, 679 F.2d 516, 529 (5th Cir.1982), *cert. denied*, 460 U.S. 1082, 103 S.Ct. 1770, 76 L.Ed.2d 344 (1983) (appeal of trial court's ruling on motion for judgment notwithstanding the verdict); *Yoder Bros. v. California–Florida Plant Corp.*, 537 F.2d 1347, 1367 (5th Cir.1976), *cert. denied*, 429 U.S. 1094, 97 S.Ct. 1108, 51 L.Ed.2d 540 (1977) (appeal of directed verdicts); *Twin Cities Sportservice, Inc. v. Charley O. Finley & Co.*, 512 F.2d 1264, 1274 (9th Cir.1975), *cert. denied*, 459 U.S. 1009, 103 S.Ct. 364, 74 L.Ed.2d 400 (1982) (appeal of trial court judgment); *R.C. Dick Geothermal Corp. v. Thermogenics, Inc.*, 566 F.Supp. 1104, 1111 (N.D.Cal.1983) (entry of summary judgment). *See also Colorado Interstate Gas Co. v. Natural Gas Pipeline Co. of Am.*, 885 F.2d 683, 694 n. 18 (10th Cir.1989), *cert. denied*, 498 U.S. 972, 111 S.Ct. 441, 112 L.Ed.2d 424

---

**3.** The Ninth Circuit stated that:

While market share is just the starting point for assessing market power, we think that market share, at least above some level, could support a finding of market power in the absence of contrary evidence. Where such an inference is not implausible on its face, an allegation of a specific market share is sufficient, as a matter of pleading, to withstand a

motion for dismissal. With nothing but Hunt's complaint before us, we cannot say that allegations that Ragu had a 65 per cent market share, and that the share of the market was increasing, could not under any market conditions provide a basis for inferring the requisite market power.

*Hunt–Wesson*, 627 F.2d at 925.

(1990) (appeal of denial of motions for judgment notwithstanding the verdict and for new trial); *Syufy Enterprises v. American Multicinema, Inc.*, 793 F.2d 990, 995 (9th Cir.1986), *cert. denied*, 479 U.S. 1031, 107 S.Ct. 876, 93 L.Ed.2d 830 and 479 U.S. 1034, 107 S.Ct. 884, 93 L.Ed.2d 838 (1987) (appeal of ruling on motion for judgment notwithstanding the verdict).

Pilkington states that "PPG resorts to a tortured analysis to convert the 20 percent worldwide market share ... into something more by referencing Pilkington's position in a different alleged market, ... 'the development, construction, and licensing of float process plants.'" Motion, at 7 (quoting PPG's Complaint ¶ 13). Pilkington asserts that PPG alleges that Pilkington uses its monopoly control of the float process technology through licensing agreements to dictate who may enter the market for the production and sale of flat glass. Pilkington argues that "the law does not permit PPG to graft Pilkington's position in this second 'market' onto Pilkington's position in the alleged market for the production and sale of flat glass" thereby creating a Section 2 attempted monopolization claim. *Id.* at 7 (citing *Alaska Airlines*, 948 F.2d at 547). According to Pilkington, the Ninth Circuit has rejected the use of this "monopoly leveraging" theory to create a Section 2 violation. *Id.*

Because market share is the "chief barometer" for assessing market power, Pilkington asserts that PPG's allegation that Pilkington possesses a 20 percent world market share is likewise insufficient to support its allegation that there exists a dangerous probability of success by Pilkington. *See, e.g., Richter Concrete Corp. v. Hilltop Concrete Corp.*, 691 F.2d 818, 826 (6th Cir.1982) (appeal of directed verdicts); *Lektro–Vend Corp. v. Vendo Co.*, 660 F.2d 255, 271 (7th Cir.1981), *cert. denied*, 455 U.S. 921, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982) (appeal of district court's findings after bench trial); *Nifty Foods Corp. v. Great Atl. & Pac. Tea Co.*, 614 F.2d 832, 841 (2nd Cir.1980); *United States v. Empire Gas Corp.*, 537 F.2d 296, 305 (8th Cir.1976), *cert. denied*, 429 U.S. 1122, 97 S.Ct. 1158, 51 L.Ed.2d 572 (1977) (appeal of trial court judgment).

### B. PPG's Opposition

PPG states that "[r]ather than attempting to attack the actual allegations made in Counts Four and Five ..., Pilkington has instead effectively rewritten Counts Four and Five and confines itself to an attack on this rewritten version of the complaint." Opposition, at 1. Contrary to Pilkington's alleged mischaracterization of its Complaint, PPG states that it actually alleged that Pilkington has established and maintained monopoly power in an interrelated regional set of markets. *See* Complaint ¶¶ 17, 18, 35, 38. It disputes Pilkington's assertion that it alleged that Pilkington has monopolized a world market for flat glass or relied on Pilkington's 20 percent market share as evidence of market power. PPG asserts that, given modern notice pleading, its Complaint could not be disposed of on a preliminary motion before discovery and the presentation of evidence.

PPG states that it did not allege that there is a single, world market for flat glass. Paragraph 13 of the Complaint states that "Pilkington holds monopoly power over the worldwide market for the development, construction and licensing of float process plants and the related markets for the sale of flat glass." As to the particular, regional markets, PPG asserts that the precise geographical market boundaries, Pilkington's share of those markets, and consequent monopoly power can only be ascertained through discovery. It further states that:

> Pilkington's sales are not evenly distributed throughout the world. Pilkington adopted a strategy of licensing its technology in certain regions of the world, carefully delimiting the production, and in some cases the sale, of glass by these licensees to specific regions [*see* Complaint, para. 20], while expressly and intentionally reserving for itself other regions (*e.g.*, Argentina and Australia). In those reserved regional markets, Pilkington has enjoyed as much as 100 percent of the region's glass production, and has excluded other competitors by a variety of exclusionary practices, some of which are described in paragraph 18 of the complaint.

Contrary to the assertions made in Pilkington's present motion, PPG's complaint contains not only a general allegation of Pilkington's monopolization of regional markets, but, by way of example, allegations that Pilkington and its co-conspirators have monopolized flat glass sales in two of the interrelated markets for the sale of flat glass, Argentina and Australia.

In Argentina, PPG has alleged that Pilkington's sole licensee and co-conspirator, Vidoieria Argentina S.A. ("Vasa"), of which Pilkington owns 65 percent, possesses monopoly power. [*See* Complaint, para. 18(a)]

. . . .

Similarly, PPG has alleged that, in Australia, Pilkington (Australia) Limited is the sole float manufacturer. [*See* Complain, para. 18(b)]

Opposition, at 6–7 (emphasis in original).[4] Thus, PPG argues that its allegations are sufficient to state a claim under Section 2 of the Sherman Act. *See Fox Chem. Co. v. Amsoil, Inc.,* 445 F.Supp. 1355, 1360 (D.Minn.1978), *cited with approval by Hunt–Wesson,* 627 F.2d at 925.

In regard to Pilkington's "monopoly leveraging" argument, PPG argues that the principles stated in *Alaska Airlines* do not support the dismissal of Counts Four and Five. It states that:

> The monopoly leveraging theory at issue in *Alaska Airlines* was first enunciated in *Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263 (2d Cir.1979), *cert. denied,* 444 U.S. 1093, [100 S.Ct. 1061, 62 L.Ed.2d 783] (1980). In both cases, the relevant issue was whether a Section 2 violation could be made out under circumstances in which a defendant was using "monopoly power in one market to gain a competitive advantage in another." *Id.* at 275; *accord Alaska Airlines,* 948 F.2d at 546. However, both courts expressly distinguished cases in which monopoly power in the first market is used to "attempt to *monopolize* the second market." *Id.* at 275 (emphasis

added); *accord Alaska Airlines,* 948 F.2d at 546.

Opposition, at 13. PPG asserts that it has alleged that Pilkington has used its monopoly power over the float process technology in an attempt to create or maintain monopolies in regional markets for the production and sale of flat glass.

### C. Pilkington's Reply

Pilkington cites a recent Supreme Court case, *Spectrum Sports v. McQuillan,* —— U.S. ——, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993), for the proposition that in an attempted monopolization case "the demands that Section 2 places on a plaintiff are 'plainly not met by inquiring only whether the defendant has engaged in "unfair" or "predatory" tactics,' but 'require[ ] inquiry into the relevant product and geographic market and the defendant's economic power in that market.' " Reply, at 2 (quoting *Spectrum Sports,* at ——, 113 S.Ct. at 892). Pilkington characterizes this holding of the Supreme Court as creating a "monopoly power screen" for attempted monopolization cases. Reply, at 2.

### D. Discussion

#### (1) Rule 12(b)(6) Standard

The purpose of a motion to dismiss for failure to state a claim is to test the formal sufficiency of the pleadings. 5A Wright & Miller, *Federal Practice and Procedure* § 1356, at 294 (2d ed. 1990). It is not "a procedure for resolving a contest about the facts or the merits of the case." *Id.* Thus, the pleadings at issue are viewed in the light most favorable to the nonmovant, with every doubt resolved in his behalf, and his allegations taken as true. *Abramson v. Brownstein,* 897 F.2d 389, 391 (9th Cir.1990). The rule is that a complaint should not be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957); *Abramson,* 897 F.2d at 391.

---

4. PPG also cites documentary evidence, such as Pilkington's 1992 Annual Report, and declarations of counsel to support its allegations. But because this a Rule 12(b)(6) motion, the Court will simply take PPG's allegations as true and not look beyond the Complaint. Therefore, the Court will not consider this documentary evidence in reaching its decision.

■ "In an antitrust action, the complaint need only allege sufficient facts from which the court can discern the elements of an injury resulting from an act forbidden by the antitrust laws." *Newman v. Universal Pictures*, 813 F.2d 1519, 1522 (9th Cir.1987), *cert. denied*, 486 U.S. 1059, 108 S.Ct. 2831, 100 L.Ed.2d 931 (1988). Thus, under Fed. R.Civ.P. 12(b)(6), the Court could properly dismiss Counts Four and Five for failure to state a claim for relief " 'only if it is clear that no relief could be granted under any set of facts that could be proved consistent with [its] allegations.' " *Id.* at 1521–22 (quoting *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984)).

(2) Analysis

The Court will deny Defendants' Motion to Dismiss. The Court finds that PPG's allegations regarding monopoly power and the existence of a dangerous probability thereof are sufficiently well pleaded to withstand a Rule 12(b)(6) motion. *See Newman*, 813 F.2d at 1522.

Most of the cases cited by Pilkington do not address Rule 12(b)(6) motions in antitrust cases. There is a distinct difference between the elements that must be satisfied to prove a defendant liable for a Section 2 violation and Fed.R.Civ.P. 8(a)(2)'s requirement of "a short and plain statement of the claim showing that the pleader is entitled to relief." *Spectrum Sports* is an example. Pilkington cites *Spectrum Sports* for the proposition that the Supreme Court has recently imposed a "monopoly power screen" in attempted monopolization cases. Although the case makes it clear that a defendant may not be held liable for attempted monopolization without proof of a dangerous probability of monopolization in a relevant market, *see Spectrum Sports*, —— U.S. at ——, 113 S.Ct. at 892, the Court questions its utility on a motion to dismiss for failure to state a claim.

*Spectrum Sports* does not deal with the district court's ruling on a motion to dismiss. After a jury verdict finding that the defendants had violated Section 2, the issue in the Supreme Court was whether the district court correctly instructed the jury on the elements of attempted monopolization. *Id.* at ——, 113 S.Ct. at 887. The district court defined the elements correctly under applicable Ninth Circuit precedent, but this precedent conflicted with the law announced in the other circuits. *Id.* at ——, 113 S.Ct. at 889. The Supreme Court strongly disapproved of the prior Ninth Circuit precedent and defined the elements of an attempted monopolization claim in accordance with the rest of the circuits. *Id.* at ——, 113 S.Ct. at 891 ("We are not at all inclined . . . to embrace *Lessig*'s interpretation of § 2, for there is little if any support for it in the statute or the case law, and the notion that proof of unfair or predatory conduct alone is sufficient to make out the offense of attempted monopolization is contrary to the purpose and policy of the Sherman Act.").[5] Thus, the Supreme Court held that antitrust defendants "may not be held liable for attempted monopolization under § 2 of the Sherman Act absent proof of a dangerous probability that they would monopolize a particular market and specific intent to monopolize." *Id.* at ——, 113 S.Ct. at 892. The dangerous probability of monopolization "requires inquiry into the relevant product and geographic market and the defendant's economic power in that market." *Id.* Thus, although the Supreme Court may have imposed a "monopoly power screen" for liability, in terms of a Rule 12(b)(6) motion, *Spectrum Sports* merely eliminates the possibility that allegations of "clearly exclusionary conduct" would suffice to state a claim for attempted monopolization in the absence of allegations of a dangerous probability of monopolization.

■ With the exception of *Hunt–Wesson*, the "legion" of cases cited by Pilkington to support its argument that an allegation of a 20% world market share is insufficient to state a claim for monopolization and attempted monopolization concern determinations on summary judgment motions, motions for directed verdicts, and post-trial motions. As such, they are of little use to the Court. The Court, of course, does not question that an allegation of a 20% market share in a rele-

---

5. The Supreme Court was referring to *Lessig v. Tidewater Oil Co.*, 327 F.2d 459 (9th Cir.), *cert.* *denied*, 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964), and its progeny.

vant market would fail to state claim under Rule 12(b)(6). The Court finds, however, that PPG's allegations sufficiently allege that Pilkington possesses market power in several regional markets for the sale of flat glass. See ¶¶ 17, 18(a), 18(b), 35, 38, 39. PPG does allege that Pilkington has monopolized the world market for float glass technology. However, when describing Pilkington's conduct and power in regard to the production and sale of flat glass, PPG refers to regional markets. When the Court reads PPG's allegations describing Pilkington's market power in "world markets," it views the pleadings at issue in the light most favorable to PPG and with every doubt resolved in its behalf. *Brownstein*, 897 F.2d at 391. *See also Les Shockley Racing, Inc. v. National Hot Rod Ass'n*, 884 F.2d 504, 507 (9th Cir.1989). Thus, the Court finds that these allegations do not describe a single world market for the production and sale of flat glass.

The Court is mindful that "a claimant must, as a minimum, sketch the outline of the antitrust violation with allegations of supporting factual detail." *Les Shockley Racing*, 884 F.2d at 508. However, the Court finds that PPG's allegations contained in paragraphs 18(a) and 18(b), describing the existence of monopoly power or the dangerous probability of monopolization in the Australian and Argentinean markets, fulfill this requirement. *See Newman*, 813 F.2d at 1522 ("In an antitrust action, the complaint need only allege sufficient facts from which the court can discern the elements of an injury resulting from an act forbidden by the antitrust laws."). Here, the Court cannot conclude that "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Id.* at 1521–22 (quoting *Hishon*, 467 U.S. at 73, 104 S.Ct. at 2232).

## III. *Motion to Stay Proceedings and Compel Arbitration or Dismiss*

The determinative questions are: (1) whether PPG's antitrust claims are arbitrable under the 1962 License Agreement; and (2) if so, whether the 1962 License Agreement's choice-of-forum and choice-of-law provisions operate as a prospective waiver of these claims by precluding the application of United States antitrust law.

## A. Whether PPG's Claims Are Arbitrable Under the 1962 License Agreement

(1) Pilkington's Argument

Article XII of the 1962 License Agreement provides, in pertinent part, under the heading of "Arbitration" that:

> **Any dispute involving the meaning, interpretation, application or violation of the provisions of this agreement** which cannot be settled by discussion and mutual accord **shall be settled by arbitration** by three arbitrators of whom one shall be nominated by [Pilkington], one by [PPG], and a third by the two arbitrators to be nominated.
>
> . . . .
>
> The seat of the arbitration shall be in London, and the arbitration shall be in accordance with the laws of England.
>
> The decision of the arbitrators shall be final and binding on the parties.

1962 License Agreement, Article XII (emphasis added). Article XIII of the 1962 License Agreement provides, under the heading of "Construction," that "the Agreement shall be governed by the laws of England."

Pilkington notes that it brings this Motion pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1–16, 201–208, and that the FAA embodies an "emphatic federal policy in favor of arbitral dispute resolution[,]" . . . which "applies with special force in the field of international commerce." *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 631, 105 S.Ct. 3346, 3356, 87 L.Ed.2d 444 (1985). The FAA, in pertinent part, states that:

> . . . .
>
> If any suit . . . be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, **the court** in which such suit is pending, **upon being satisfied that the issue involved in such suit . . . is referable to arbitration under such an agreement, shall upon application of one of the parties stay the**

**trial of the action until such arbitration has been had** in accordance with the terms of the agreement....

9 U.S.C. § 3 (emphasis added). The FAA also requires courts to refer parties to arbitration outside of the United States if their agreement provides for arbitration in a foreign country. *See* 9 U.S.C. § 206. The United States has ratified The Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("New York Convention") and Congress has provided for the enforcement of such awards in United States courts. *See* 9 U.S.C. § 201.

■ "[T]he [FAA] leaves no place for the exercise of discretion by a district court, but instead mandates that the district court *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean, Witter Reynolds v. Byrd,* 470 U.S. 213, 218, 105 S.Ct. 1238, 1241, 84 L.Ed.2d 158 (1985) (emphasis in original). " 'Therefore, the district court *can only* determine whether a written arbitration agreement exists, and if it does, enforce it in accordance with its terms.' " *Republic of Nicaragua v. Standard Fruit Co.,* 937 F.2d 469, 475 (9th Cir.1991) (quoting *Howard Elec. & Mech. Co., Inc. v. Frank Briscoe Co.,* 754 F.2d 847, 849 (9th Cir.1985)), *cert. denied,* —— U.S. ——, 112 S.Ct. 1294, 117 L.Ed.2d 516 (1992) (emphasis in original). Thus, the Court's "role is strictly limited to determining arbitrability and enforcing agreements to arbitrate, leaving the merits of the claim and any defenses to the arbitrator." *Standard Fruit,* 937 F.2d at 478.

In making the above determinations, the Court is to "appl[y] the 'federal substantive law of arbitrability,' " which is " 'applicable to any arbitration agreement within the Coverage of the Act.' " *Mitsubishi,* 473 U.S. at 626, 105 S.Ct. at 3353 (quoting *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983)). The Supreme Court further stated:

[T]hat body of law counsels:

> "that questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration.... The [FAA] establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Memorial Hosp.,* 460 U.S. at 24–25, 103 S.Ct. at 941–942.

> *See, e.g., Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582–583, 80 S.Ct. 1347, 1352–1353, 4 L.Ed.2d 1409 (1960). Thus, as with any other contract, the parties' intentions control, but those intentions are generously construed as to issues of arbitrability.

*Id.*

Pilkington, of course, argues that PPG's claims constitute a "dispute" that the parties agreed to arbitrate under Article XII. It characterizes the wording of Article XII as "quite broad." Pilkington's Memorandum, at 11. Pilkington states that:

> As an initial matter, the clause comprehends "[a]ny dispute," regardless how defined, if it involves the Agreement.

> The word "involving" is also expansive. As the arbitration panel stated in determining that the 1988 Draft Complaint[6] was arbitrable: "[t]he word 'involving' is an ordinary word of the English language and it expresses a certain nexus between the dispute and the License Agreement, a nexus which is of a general nature. Thus, a dispute may 'involve' the License Agreement even though it does not concern a contractual claim under the Agreement." Walsh Declaration Tab 2 at 3–4. The word "involving" carries the same meaning here as "relating to," which courts have found denotes a broad arbitration clause. *See Todd Shipyards Corp. v. Cunard Line, Ltd.,* 943 F.2d 1056, 1060 (9th Cir.1991) (" 'Any and every dispute, difference or

---

6. During the arbitration proceedings begun in 1985, PPG submitted a draft federal court complaint alleging antitrust claims to the arbitrators for an advisory opinion concerning the arbitrability of the claims.

question ... relating to this Agreement' " is an "expansive arbitration provision.")

. . . .

Moreover, courts have consistently held that arbitration clauses covering disputes that concern the "interpretation" of a contract, the "meaning and application" of contract clauses, and similar phrases are very broad in their coverage and should be broadly construed.

*Id.* at 11–12.

As support, Pilkington cites a number of cases. *Warrior and Gulf,* 363 U.S. at 576, 584–85, 80 S.Ct. at 1349, 1353–54 (clause requiring arbitration of "differences ... as to the meaning and application of the provisions of the Agreement" described as "quite broad"); *United Steelworkers of Am. v. American Mfg. Co.,* 363 U.S. 564, 565 n. 1, 80 S.Ct. 1343, 1345 n. 1, 4 L.Ed.2d 1403 (1960); *Challenger v. Local Union No. 1 of the Int'l Bridge, Structural, and Ornamental Ironworkers, AFL-CIO,* 619 F.2d 645, 647 (7th Cir.1980). According to Pilkington, the Ninth Circuit has construed equivalent language to Article XII. *Mediterranean Enterprises, Inc. v. Ssangyong Corp.,* 708 F.2d 1458, 1464 (9th Cir.1983) (contrasting the phrase "arising out of or relating to this agreement" with "arising hereunder" and finding that the former is more expansive than the latter). Finally, Pilkington compares Article XII with the *Mitsubishi* clause and characterizes the *Mitsubishi* clause as narrower because it referred only to portions of that agreement. Pilkington's Memorandum, at 14. The Supreme Court stated that:

. . . .

insofar as the allegations underlying the statutory claims touch matters covered by the enumerated articles, the Court of Appeals properly resolved any doubts in favor of arbitrability.

*Mitsubishi,* 473 U.S. at 624 n. 13, 105 S.Ct. at 3353 n. 13.

Next, Pilkington specifies the reasons why it believes that PPG's claims " 'touch matters' covered by the Agreement and therefore must be arbitrated." Pilkington's Memorandum, at 14 (quoting *Mitsubishi,* 473 U.S. at

624 n. 13, 105 S.Ct. at 3353 n. 13). Pilkington makes the following assertions:

(1) Because the Complaint alleges that Pilkington has used the 1962 License Agreement to keep PPG from using its LB process in specific world markets, Pilkington asserts that this claim involves the application of the Agreement, *see* Complaint ¶¶ 1, 19;

(2) Because the Complaint alleges that Pilkington has misused the 1962 License Agreement to restrict the quantity of glass that licensees may manufacture, to create barriers to entry, and to establish monopolies, Pilkington asserts that these claims touch matters covered by the Agreement, *see* Complaint ¶¶ 7–14, 20;

(3) Because the Complaint alleges that Pilkington has used the restrictive terms of the 1962 License Agreement to suppress competition, Pilkington asserts that this claim involves the application of the Agreement, *see* Complaint ¶ 17;

(4) Because the Complaint alleges that one of Pilkington's anticompetitive acts was to use Article XII requiring PPG to submit to arbitration, Pilkington asserts that this claim calls into question the meaning, interpretation, application, or violation of the Agreement, *see* Complaint ¶ 18(a); and

(5) Because the Complaint's prayer for relief asks the Court to declare that the Agreement's restraints are "null, void and unenforceable," Pilkington asserts that this relief requires the Court to apply or interpret the Agreement.

Pilkington's Memorandum, at 15–18.

Pilkington argues that PPG has cosmetically re-worked its 1988 draft complaint in an attempt to avoid the impact of *Mitsubishi.* Citing "PPG's efforts to clutter its current Complaint with allegations concerning exports to Argentina and other foreign locales and misconduct in the 'flat glass market,' " Pilkington states that these claims are likewise subject to arbitration because they are premised on the 1962 License Agreement. *Id.* at 19–20. As support, it cites the First Circuit's decision in *Mitsubishi. Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 723 F.2d 155, 160–61 (1st Cir.1983), *aff'd*

*in part, rev'd in part, Mitsubishi,* 473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1987).

### (2) PPG's Opposition

In reference to the terms of Article XII, PPG states that:

> The terms "meaning" and "interpretation" refer to the definition of the provisions of the Float License. The term "application" refers to the manner in which a provision of the Float License is supposed to operate in a given circumstance. The term "violation" refers to whether a party has breached a provision of the Float License. That is *all* the parties agreed to arbitrate under the Float License.

> Resolution of the issues raised in PPG's complaint does not require this Court to determine the meaning of any term in the Float License or whether Pilkington has violated any provision.

Opposition, at 2 (emphasis in original).

PPG disputes Pilkington's argument that Article XII is broader in scope than the *Mitsubishi* arbitration clause. The latter provision provides that:

> "All disputes, controversies or differences which may arise between [the parties] out of or in relation to Articles I–B through V of this Agreement or for the breach thereof, shall be finally settled by arbitration."

*Mitsubishi,* 473 U.S. at 617, 105 S.Ct. at 3349. PPG argues that Article XII and the *Mitsubishi* clause differ because: (1) Article XII applies only to disputes "involving the meaning, interpretation, application or violation of the provisions of" the 1962 License Agreement; and (2) the term "involving" is narrower in scope than the clause "aris[ing] out of or in relation to" as the latter is used in the *Mitsubishi* provision. PPG asserts that Article XII, read as a whole, is "limited to disputes requiring a decision as to the 'meaning' of provisions in the agreement or the parties' 'violation' of those provisions." Opposition, at 5.

PPG argues that Pilkington's construction "ignores controlling Ninth Circuit precedent that makes clear that the omission of the phrase 'relating to' is 'significant' and indi-

cates that the agreement is 'intended to cover a much narrower scope of disputes.'" *Id.* (quoting *Mediterranean Enter.,* 708 F.2d at 1463–64). *See also Swensen's Ice Cream Co. v. Corsair Corp.,* 942 F.2d 1307, 1309 (8th Cir.1991); *In re Kinoshita & Co.,* 287 F.2d 951, 953 (2nd Cir.1961); *American President Lines, Ltd. v. S. Woolman, Inc.,* 239 F.Supp. 833, 836 (S.D.N.Y.1964). PPG further argues that the terms "meaning, interpretation, application or violation" also limit the scope of disputes subject to arbitration. *See Northern Cal. Newspaper Guild Local 52 v. Sacramento Union,* 856 F.2d 1381, 1383 (9th Cir.1988) (clause "limit[ing] arbitrable disputes to those involving 'application of' the Agreement" limited arbitrable disputes to those "involving construction of the substantive provisions of the contract"). PPG states that:

> The absence of the phrase "relating to" and the presence of the other words of limitation, "meaning, interpretation, application or violation," make it obvious that this arbitration clause was designed to cover a much narrower class of disputes than the clauses on which Pilkington relies.

Opposition, at 6–7.

PPG also argues that its interpretation is supported by the fact that "several other agreements ... between [the parties] provided for arbitration for '[a]ny controversy or claim arising out or relating to this agreement.'" *Id.* at 7 (citing Zoghby Declaration, Tabs 2–6). PPG notes that this language is similar to that in *Mitsubishi* and, thus, demonstrates that the parties could agree on a broader class of arbitrable disputes when they so desired.

PPG challenges Pilkington's assertion, based on language in *Mitsubishi,* that disputes that "touch matters covered by" the 1962 License Agreement are arbitrable. According to PPG, the fact that the *Mitsubishi* provision was much broader in scope than the one at issue here renders the "touch matters" standard inappropriate here. The question for the Court, as framed by PPG, is whether PPG's claims require the Court to decide a "dispute involving the meaning, interpretation, application or violation of the provisions of" the 1962 License Agreement.

**1476**

PPG asserts that the following claims do not require that inquiry:

(1) Pilkington's alleged imposition of exclusive dealing agreements on purchasers of glass;

(2) Pilkington's alleged acquisition of independent flat glass wholesalers, distributors, and manufacturers thereby facilitating the imposition of exclusive dealing agreements;

(3) Pilkington's use of litigation to allegedly coerce competitors into acceptance of restraints, to suppress competition from competitive technologies, and to create barriers to entry; and

(4) Pilkington's alleged economic and legal threats to potential customers, suppliers, and financial backers of companies that compete with it.

*See* Complaint ¶¶ 13–18. In reference to Pilkington's use of litigation, PPG asserts that:

None of those allegations raises any dispute about the meaning or violation of any agreements underlying those suits. Whatever the meaning of the terms of those agreements and whether they were violated ..., Pilkington has used that litigation as part of its scheme to monopolize the markets for float glass technology and flat glass and thereby violated the Sherman Act.

Opposition, at 11.

According to PPG, its prayer for relief does not demonstrate that its claims are arbitrable. PPG states that the 1962 License Agreement provides that "the arbitrators shall not have the power to alter, amend or add to the provisions of this Agreement." *See* 1962 License Agreement, Article XII. Thus, PPG argues that, because only this Court has the power to declare the Agreement "null, void and unenforceable," its prayer for relief is a further demonstration that its claims are not arbitrable.

In an attempt to distinguish *Mitsubishi,* PPG asserts that its monopolization claims are unlike *Mitsubishi*'s contract-related claims. According to PPG, the *Mitsubishi* claims directly implicated the parties' performance under their contract whereas "the dispute here centers around whether the agreement played a role in a much wider [anticompetitive] scheme." *Washburn v. Societe Commerciale de Reassurance,* 831 F.2d 149, 151 (7th Cir.1987) (reinsurance agreement's arbitration provision did not cover RICO claims, which alleged a conspiracy to use various agreements and "several other devices ... to drive [a company] further into insolvency and defraud entities and individuals who had interests in the continued viability of [the company]"). *See also Swensen's,* 942 F.2d at 1310.

PPG also challenges Pilkington's citation of the 1988 advisory opinion of the arbitrators. First, PPG asserts that the two complaints at issue differ markedly. According to PPG, "[t]he 1988 draft complaint was based entirely on PPG's allegation that Pilkington was 'wrongfully and wilfully asserting beyond any possible warrant that information licensed to PPG under the 1962 license remains protectible as trade secret information.'" Opposition, at 17. Thus, PPG argues that the 1988 arbitration and the 1988 draft complaint were both based on the narrow question of whether Pilkington "know-how" had become public information whereas the Complaint in this action does not involve that issue. *Id.* Second, PPG notes that the arbitrability of its claims is to be determined under federal law rather than the English law of arbitrability. Finally, PPG quibbles about the non-binding nature of the arbitrators' 1988 advisory opinion.

PPG states that it is proper for this Court to consider the state of the law at the time the parties entered into their agreement in order to ascertain their intentions. *Norfolk & W. Ry. Co. v. American Train Dispatchers Ass'n,* 499 U.S. 117, 129, 111 S.Ct. 1156, 1164, 113 L.Ed.2d 95 (1991) ("Laws which subsist at the time and place of the making of a contract, and where it is to be performed, enter into and form a part of it, as fully as if they had been expressly referred to or incorporated in its terms".). PPG notes that, until 1978, no court had held that antitrust claims were arbitrable. Thus, PPG argues that the fact that it never attempted to renegotiate the terms of Article XII to exclude antitrust claims does not support the conclusion that

the parties intended antitrust claims to be arbitrable.

### (3) Pilkington's Reply

Pilkington attempts to distinguish *Mediterranean*, on which PPG relied for the proposition that "the omission of the phrase 'relating to' is 'significant' and indicates that the agreement is 'intended to cover a much narrower scope of disputes.'" Opposition, at 5 (quoting *Mediterranean*, 708 F.2d at 1463–64). Pilkington states that:

> [T]he Ninth Circuit did not hold that an arbitration clause that lacks the phrase "relating to" must be read as narrowly as one containing the phrase "arising hereunder."

> PPG's argument also overlooks the fact that the words "involve" or "involving" are often described as synonymous to the words "relate" or "relating to." *See Webster's New World Dictionary* 742 (2d ed. 1986) (definition of "involve" includes "to relate to"); William C. Burton, *Legal Thesaurus* 297 (1980) ("involve" defined to include the word "relate").

Reply, at 4–5.

Pilkington next argues that PPG's construction of the words "meaning, interpretation, application or violation" ignores PPG's own admonition that the clause should be "read as a whole." *See* Opposition, at 6. Additionally, Pilkington asserts that PPG has misconstrued the Ninth Circuit's holding in *Newspaper Guild*. Pilkington states that:

> The *Newspaper Guild* court held only that the arbitration clause ... did not encompass the determination of whether the underlying contract was in effect at the time the cause of action arose. *See* 856 F.2d at 1383–84. Indeed, the court characterized the clause as "broad" and remanded the case for a determination of the status of the agreement with instructions to refer the case to arbitration if the underlying contract was ... in effect. *Id.* at 1383.

Reply, at 6.

Pilkington disputes PPG's assertion that, until 1978, no court had held that antitrust claims were arbitrable. According to Pilkington, there was authority prior to 1962 that suggested that such claims were arbitrable or that it was an open issue. *See Greenstein v. National Skirt & Sportswear Ass'n, Inc.*, 178 F.Supp. 681 (S.D.N.Y.1959), *appeal dismissed*, 274 F.2d 430 (2nd Cir.1960).

Pilkington then uses PPG's own argument to demonstrate why its claims are arbitrable. According to Pilkington, PPG's allegation of Pilkington's "exclusionary conduct, including 'sham' litigation, to effect its anticompetitive scheme—undermines this point." Reply, at 9. Pilkington argues that the question of whether it misused the 1962 License Agreement to effect the alleged anticompetitive scheme or whether its use of the agreement was the legitimate protection of its intellectual property is a pivotal issue in the resolution of PPG's monopolization and attempted monopolization claims. Pilkington asserts that its "use or threatened use of litigation or regulatory proceedings necessarily touches upon issues involving the meaning, application, interpretation, or violation of the provisions of the Agreement." *Id.* at 9–10.

In rebuttal of PPG's argument that the arbitrators lack the authority to "alter, amend or add to the provisions of" the Agreement, Pilkington states that PPG ignores Article IX F., which provides the panel with power to curtail and limit provisions that are illegal. It notes that this is exactly the remedy sought by PPG in the 1988 arbitration.

In reference to PPG's assertion that its claims do not involve the meaning, interpretation, application, or violation of the Agreement's provisions because Pilkington's use of the Agreement's restrictions is part of a wider anticompetitive scheme, Pilkington states that:

> In *Washburn*, ... the court held that the plaintiff's RICO claim was not arbitrable because no analysis of the subject agreement's terms would have been relevant to the evaluation and ultimate resolution of the RICO claim. The court found that, "even if every word of the ... agreement were interpreted, this case would be no closer to a resolution.... [I]nterpreting the agreement itself would provide no assistance in resolving that issue." [*Washburn,*] 831 F.2d at 151. By contrast, the

meaning, interpretation, application and violation of the Agreement's provisions are central to the resolution of PPG's claims. . . .

Reply, at 14.

(4) Discussion

 According to PPG, the Article XII's words "[a]ny disputes involving the meaning, interpretation, application or violation of the provisions of this agreement" would be equivalent to narrow arbitration clauses such as "any dispute arising hereunder" or "any dispute arising under." But Article XII's language, the Court concludes, cannot be read as narrowly as PPG suggests. The Supreme Court instructs that the parties' intentions are to be "generously construed in favor of arbitrability" and "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Mitsubishi*, 473 U.S. at 626, 105 S.Ct. at 3353. *See also Standard Fruit*, 937 F.2d at 478 ("The scope of the [arbitration] clause must . . . be interpreted liberally"). PPG's reading of the Agreement would violate these principles. Under the 1962 License Agreement, the arbitrable claims are not limited simply to those involving breaches of the Agreement as a contract.

The Court finds that Article XII's language is a broad arbitration clause. PPG ignores the import of Article XII's inclusion of the words "involving the meaning, interpretation, application or violation of the provisions of this agreement." A dispute "involving" a contract is simply not as restrictive as one "arising under," "arising hereunder," or "arising out of." The Court finds that the word "involving" is the functional equivalent of the words "relating to." The phrase "arising out of or relating to" has been construed as creating a broad arbitration clause. *See Mediterranean Enter.*, 708 F.2d at 1464. Article XII's scope is similar in breadth. Further, the use of the words "meaning, interpretation, application or violation of" does not narrow the scope of the clause. Rather, these words, too, are expansive in nature. *See Warrior and Gulf*, 363 U.S. at 585, 80 S.Ct. at 1354 (the words "differences . . . as to the meaning and appli-

cation of" described as creating an arbitration clause that is "quite broad").

 PPG's factual allegations repeatedly accuse Pilkington of using its 1962 License Agreement as an anticompetitive tool. In regard to PPG's antitrust claims, Pilkington cannot be held liable for simply being a successful competitor. The resolution of PPG's claims will require the Court to determine whether Pilkington's use of litigation and arbitration pursuant to the Agreement was simply the legitimate protection of its intellectual property rights, or anticompetitive and · exclusionary acts. The Court will necessarily have to interpret or ascertain the meaning of the Agreement to determine if Pilkington has misused the Agreement's restraints in the manner alleged. "[T]he clear weight of authority holds that the most minimal indication of the parties' intent to arbitrate must be given full effect, especially in international disputes." *Standard Fruit*, 937 F.2d at 478 (citing *Bauhinia Corp. v. China Nat'l Mach. & Equip. Import & Export Corp.*, 819 F.2d 247, 249–50 (9th Cir.1987); *Mediterranean*, 708 F.2d at 1462–63). Based on this policy of liberal interpretation of the scope of arbitration clauses, therefore, PPG's claims are arbitrable under Article XII of the 1962 License Agreement.

. . . .

. . . .

B. **Whether the 1962 License Agreement's choice-of-forum and choice-of-law provisions operate as a prospective waiver of these claims by precluding the application of United States antitrust law**

(1) Pilkington's Argument

Pilkington argues that the 1962 License Agreement's choice-of-forum and choice-of-law provisions will not preclude the application of U.S. antitrust law by the arbitral panel. First, it asserts that Article XII is simply a provision mandating a choice of procedural, rather than substantive, law. *Valero Refining, Inc. v. M/T Lauberhorn*, 813 F.2d 60, 64 n. 5, 65 (5th Cir.1987). It states that Article XII's reference to · the "laws of England" read in conjunction with

the provision specifying the "seat of arbitration," is "naturally read as a reference to the 'rules' of arbitration." Pilkington's Memorandum, at 24. Pilkington asserts that Article XII mirrors a clause in the *Mitsubishi* agreement specifying that "[a]ll disputes … shall be finally settled by arbitration in Japan in accordance with the rules and regulations of the Japan Commercial Arbitration Association." *Mitsubishi*, 473 U.S. at 617, 105 S.Ct. at 3349. According to Pilkington, both clauses' use of the phrase, "in accordance with," denotes the rules or laws governing the procedure to be used. Pilkington argues that its interpretation of the Agreement is buttressed by Article XIII, which provides that the Agreement "shall be governed by the laws of England." Pilkington states that Article XIII would be redundant if Article XII was a complete choice of law provision.

Second, Pilkington asserts that Article XIII does not mandate the application of English law to every dispute that may "involve" the 1962 License Agreement. The correct reading of Article XIII, argues Pilkington, is that the provision requires the application of English law to the rights and obligations of the parties under the contract. According to Pilkington, Article XIII does not govern every dispute that may "involve" the Agreement under Article XII. *See In re Hops Antitrust Litig.*, 655 F.Supp. 169, 170 (E.D.Mo.), *appeal dismissed*, 832 F.2d 470 (8th Cir.1987). *See also Gemco Latinoamerica, Inc. v. Seiko Time Corp.*, 671 F.Supp. 972, 975 (S.D.N.Y.1987). Again, Pilkington cites *Mitsubishi* as controlling. Pilkington states that:

> There, in addition to the choice-of-forum clause (Japan) and a choice-of-procedural-rules clause (Japan Commercial Arbitration Association), the agreement also contained a choice-of-law clause: "This Agreement is made in, and will be governed by and construed in all respects according to the laws of the Swiss Confederation as if entirely performed therein." *Mitsubishi*, 473 U.S. at 637 n. 19 [105 S.Ct. at 3359 n. 19]. This clause is broader and more encompassing than the one at issue here and on its face would appear not to permit an examination of a claim under the U.S. anti-

trust laws. The Supreme Court, however, read the clause as reaching only issues concerning contract interpretation, stayed the antitrust action, and compelled the parties to arbitrate the antitrust claims in Japan under Japanese procedural rules. Similarly, the fact that Article XIII provides that the "Agreement shall be governed by the laws of England," should not act as a bar to this Court's staying these proceedings and ordering arbitration of PPG's Sherman Act claims.

Pilkington's Memorandum, at 25–26.

Pilkington then asserts that English law does not preclude the application of U.S. antitrust law in arbitration. *See* Crystal Declaration ¶¶ 6, 10. According to Pilkington, the testimony of PPG's English law expert, Mr. Sydney Kentridge, does not rebut this assertion. Pilkington characterizes all of Kentridge's testimony as confusing the issue of the scope of the arbitration clause with the issue of the law applicable to arbitral disputes.

As sort of an alternative argument, Pilkington contends that the arbitral panel, rather than this Court, should decide the law applicable to PPG's claims. *Standard Fruit*, 937 F.2d at 478 (court's role limited to determining whether the claim falls within the scope of the arbitration clause). According to Pilkington, *Atsa of Cal., Inc. v. Continental Ins. Co.*, 702 F.2d 172, 175 (9th Cir.1983), *amended*, 754 F.2d 1394 (9th Cir.1985), stands for the proposition that, in the absence of a choice-of-law provision, the Court has no authority to determine the applicable law. Instead, argues Pilkington, only "the arbitrator has the authority to determine the applicable law." *Id.* Thus, it states that the correct procedure mandated by *Mitsubishi* is for the Court to consider the law applicable to PPG's claims only at the enforcement stage after the arbitral panel has ruled. The Supreme Court stated that:

> Nor need we consider now the effect of an arbitral tribunal's failure to take cognizance of the statutory cause of action on the claimant's capacity to reinstate suit in federal court. We merely note that in the event the choice-of-forum and choice-of-law

clauses operated in tandem as a prospective waiver of a party's right to pursue statutory remedies for antitrust violations, we would have little hesitation in condemning the agreement as against public policy. *Mitsubishi*, 473 U.S. at 637 n. 19, 105 S.Ct. at 3359 n. 19. The Supreme Court further stated that:

> Having permitted the arbitration to go forward, the national courts of the United States will have the opportunity at the award-enforcement stage to ensure that the legitimate interest in the enforcement of the antitrust laws has been addressed. The [New York] Convention reserves to each signatory country the right to refuse enforcement of an award where the "recognition or enforcement of the award would be contrary to the public policy of that country." Art. V(2)(b).... While the efficacy of the arbitral process requires that substantive review at the award-enforcement stage remain minimal, it would not require intrusive [federal court] inquiry to ascertain that the tribunal took cognizance of the antitrust claims and actually decided them.

*Id.* at 638, 105 S.Ct. at 3359–60.

(2) PPG's Opposition

Based on *Mitsubishi's* footnote 19, PPG argues that its claims are not subject to arbitration. *Mitsubishi*, 473 U.S. at 637 n. 19, 105 S.Ct. at 3359 n. 19. According to PPG, Article XII, as applied to its antitrust claims, operates as a prospective waiver of its claims because: (1) Article XII does not permit the arbitrators to apply U.S. antitrust law to its claims; (2) English law does not permit recovery under the Sherman or Clayton Acts thereby precluding PPG from enforcing any judgment the arbitrators might issue in its favor; and (3) under Article XII, the arbitrators lack the power to alter or amend the provisions of the 1962 License Agreement.

PPG, of course, reads Articles XII and XIII as requiring the arbitrators to apply English law to all disputes "involving the meaning, interpretation, application or violation of the provisions of" the 1962 License Agreement. According to PPG, anything arbitrable under Article XII is to be decided under English law. PPG asserts that courts construing identical or narrower choice-of-law provisions are contrary to Pilkington's position. *See Armco Steel Co. v. CSX Corp.,* 790 F.Supp. 311, 318–19 (D.D.C.1991). *Accord Todd Shipyards,* 943 F.2d at 1061 n. 2, 1063; *Castelan v. M/V Mercantil Parati,* Civ. A. No. 91–1351, 1991 WL 83129 at *1, *3 (D.N.J.1991).

Further, PPG disputes Pilkington's reliance on *Mitsubishi.* First, contrary to Pilkington's position, PPG asserts that the *Mitsubishi* choice-of-law provision is not broader than the one at issue here. Second, PPG states that Pilkington ignores language of the *Mitsubishi* provision that immediately follows the choice-of-law sentence quoted by Pilkington. See *Mitsubishi,* 723 F.2d at 158 n. 1. According to PPG, this subsequent language makes it clear that, despite the choice of Swiss law, the arbitrators could consider U.S. antitrust law. PPG states that the 1962 License Agreement "prohibits any such flexibility." Opposition, at 27. Finally, PPG notes that: (1) Mitsubishi "conceded that American law applied to the antitrust claims and represented that the claims had been submitted to the panel in Japan on that basis; (2) Soler did not argue otherwise; and (3) the Supreme Court specifically refused to rule on the scope of the choice-of-law provision. *Mitsubishi,* 473 U.S. at 637 n. 19, 105 S.Ct. at 3359 n. 19.

PPG argues that *Mitsubishi* supports the Court's prospective determination of whether the effect of Articles XII and XIII "warrant setting aside the forum-selection clause." *Id.* at 632, 105 S.Ct. at 3357.[7] PPG states that:

---

7. The full quote is as follows:
The mere appearance of an antitrust dispute does not alone warrant invalidation of the selected forum on the undemonstrated assumption that the arbitration clause is tainted. A party resisting arbitration of course may attack directly the validity of the agreement to arbi-

trate. *See Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967). Moreover, the party may attempt to make a showing that would warrant setting aside the forum-selection clause—that the agreement was "[a]ffected by fraud, undue influence, or overweening bar-

Pilkington's argument ... that *Mitsubishi* held that consideration of this issue must await the enforcement of the award is misplaced. In *Mitsubishi*, the antitrust claims had been submitted to arbitration under U.S. law before the Court's condemnation of the case. This fact alone explains the Court's statement that, "[h]aving permitted the arbitration to go forward, the national courts of the United States will have the opportunity at the award-enforcement stage to ensure that the legitimate interest in the enforcement of the antitrust laws has been addressed." [*Mitsubishi*, 473 U.S.] at 638 [105 S.Ct. at 3360].

Pilkington's argument ignores the Court's reliance on cases holding that prospective waivers or releases of antitrust claims invalid. *Id.* The argument also overlooks the [FAA], which provides that a court may refuse to enforce an arbitration clause "upon such grounds as exist at law or in equity for the revocation of any contract," and the [New York Convention], which provides that a court may refuse to enforce an arbitration clause if "it finds that said agreement is null and void, inoperative or incapable of being performed." *See* 9 U.S.C. § 2; New York Convention, Article II(3) (*reprinted at* 9 U.S.C.A. § 201 (Supp.1992)).

Opposition, at 29–30.

According to PPG, even if the arbitrators could apply U.S. antitrust law to its claims, the panel would still be unable to afford PPG complete relief because Article XII prevents the arbitrators from "alter[ing], amend[ing] or add[ing] to the provisions of this Agreement." Thus, PPG asserts that the arbitrators would have to leave the illegal aspects of the 1962 License Agreement intact. Further, it states that no English court would enforce a judgment against Pilkington because of the English hostility to U.S. anti-

trust law and the United Kingdom's blocking statute.

(3) Pilkington's Reply

In reference to PPG's citation of language of the *Mitsubishi* provision that immediately follows the choice-of-law sentence quoted by Pilkington, *see Mitsubishi*, 723 F.2d at 158 n. 1, Pilkington states that there is no indication that the Supreme Court relied on this language in reaching its decision. It further asserts that the language stands for nothing more than "the unremarkable proposition that should a provision of the distribution agreement be found violative of any jurisdiction's laws, the remaining provisions would remain in effect." Reply, at 17. Finally, Pilkington notes that Article IX F. of the 1962 License Agreement is similar.

Pilkington attempts to distinguish PPG's reliance on *Armco Steel*, 790 F.Supp. at 318–19, as follows:

First, unlike the situation in *Armco*, there is evidence in the record that the parties did not intend the Agreement's choice-of-law clause to govern all the disputes that might arise between them. *See* Crystal Decl., ¶ 21. Second, the application of English law to this question, unlike the application of Ohio law, would not bar the arbitration of PPG's antitrust claims because there is no basis in English law prohibiting an arbitration panel sitting in London from applying the U.S. antitrust laws. (Mem. at 26–29.) Indeed, Article IX F. requires it. In addition, PPG's own barrister does not dispute this point: "I agree with Mr. Crystal's statement (para. 9) that there is no reason in public policy (or, I would add, in English law) why parties could not agree to have an antitrust dispute arbitrated in accordance with United States law in an arbitration held in England." Kentridge Decl., ¶ 4.

Reply, at 17–18.

In rebuttal of PPG's argument that it could not enforce any judgment it obtained in

gaining power"; that "enforcement would be unreasonable and unjust"; or that proceedings "in the contractual forum will be so gravely difficult and inconvenient that [the resisting party] will for all practical purposes be deprived of his day in court." *The Bremen [v. Zapata Off–Shore Co.]* 407 U.S. [1] at 12, 15, 92

S.Ct. [1907] at 1914, 1916, 1917 [32 L.Ed.2d 513 (1972)]. But absent such a showing—and none was attempted here—there is no basis for assuming the forum inadequate or its selection unfair.
*Mitsubishi*, 473 U.S. at 632–33, 105 S.Ct. at 3357.

arbitration in England, Pilkington notes that this assertion is contrary to PPG's conduct in the 1988 arbitration. It further notes that PPG could seek enforcement of an arbitral award in "any court having jurisdiction under this chapter for an order confirming the award as against any other party to the Arbitration." 9 U.S.C. § 207. *See also Mitsubishi,* 473 U.S. at 638, 105 S.Ct. at 3360. Finally, citing Mr. Kentridge's testimony at the preliminary injunction hearing, Pilkington states that such an award would not be subject to the U.K. blocking statute.

(4) Discussion

■ Article XII provides, in pertinent part, that "[t]he seat of the arbitration shall be in London, and the arbitration shall be in accordance with the laws of England." The Court finds that Article XII's choice-of-law provision merely provides for the application of English law to govern the procedural aspects of the arbitration. Article XII's inclusion of the words "in accordance with" support the Court's conclusion. *See Mitsubishi,* 473 U.S. at 617, 105 S.Ct. at 3349. More importantly, if Article XII's choice-of-law provision was a substantive choice-of-law provision, Article XIII would be redundant. The harder question is whether Article XIII permits the arbitrators to apply U.S. antitrust law to claims in arbitration.

Article XIII of the 1962 License Agreement provides, under the heading of "Construction," that "the Agreement shall be governed by the laws of England." There is less support for Pilkington's position that Article XIII merely provides for the application of English law to contract-related claims thereby permitting the arbitrators to apply non-English law to claims that "involve" the Agreement but are not breach of contract claims. The plain language of Article XIII is quite broad.

The parties have provided conflicting expert testimony on the issue. According to the oral argument of Pilkington's counsel, which was not rebutted in any substantial fashion by PPG's counsel, the major point of disagreement between the experts is whether the English double actionability rule would preclude the application of U.S. antitrust law

to the claims in arbitration independent of the question of whether Article XII or XIII would prevent it. The Court agrees with Pilkington's counsel that the resolution of this question requires it to decide a question of English law, for which the Court is not equipped.

If Article XIII permits the arbitrators to apply U.S. antitrust law and the double actionability rule does not preclude it, however, the Supreme Court has seemingly closed the door to any thoughts that arbitrators cannot handle complex antitrust cases. In *Mitsubishi,* the Supreme Court stated that:

> [P]otential complexity should not suffice to ward off arbitration.... In any event, adaptability and access to expertise are hallmarks of arbitration. The anticipated subject matter of the dispute may be taken into account when the arbitrators are appointed, and arbitral rules typically provide for the participation of experts either employed by the parties or appointed by the tribunal. Moreover, it is often a judgment that streamlined proceedings and expeditious results will best serve their needs that causes parties to agree to arbitrate their disputes; it is typically a desire to keep the effort and expense within manageable bounds that prompts them mutually to forgo access to judicial remedies.

*Mitsubishi,* 473 U.S. at 633, 105 S.Ct. at 3357.

■ The Supreme Court has cautioned the lower courts that "[t]here is no reason to assume at the outset of the dispute that international arbitration will not provide an adequate forum." *Id.* at 636, 105 S.Ct. at 3359. Here, however, it is unnecessary to rely on a presumption that an English arbitration pursuant to Article XII will not operate as a waiver of PPG's statutory claims. At oral argument, Pilkington's counsel expressly represented that PPG's claims will be arbitrated pursuant to the substantive antitrust laws of the United States and that Pilkington consents to arbitration on that basis. Thus, as the district court stated in *In re Hops Antitrust Litig.*:

> Under the circumstances, the Court does not now find either (a) the [English] arbi-

tration proceedings will be so "gravely difficult or inconvenient," or (b) the operation of the choice of forum and choice-of-law provisions will prohibit pursuit of plaintiff's antitrust claims, as to support a court order not enforcing the parties' arbitration agreement.

*In re Hops Antitrust Litig.*, 655 F.Supp. at 172. The Court expressly refers PPG's claims to arbitration under Article XII based on Pilkington's representation and consent to the substantive arbitration of PPG's claims pursuant to U.S. antitrust law. As noted by Pilkington's counsel at oral argument, the Court may, and certainly will, withdraw the reference to arbitration if U.S. antitrust law does not govern the substantive resolution of PPG's claims. In addition, the Court directs that any damages determination, or arbitral award, made by the arbitrators shall be determined according to U.S. antitrust law irrespective of any conflict that may exist between those laws and the laws of England. Finally, the Court will retain jurisdiction over this matter in order to ensure that the arbitration directed by this Order is conducted in accordance with the Order.

## CONCLUSION

The Court finds that PPG's allegations regarding monopoly power and the existence of a dangerous probability thereof are sufficiently well pleaded to withstand a Rule 12(b)(6) motion. *See Newman*, 813 F.2d at 1522. The Court will therefore deny Pilkington's Motion to Dismiss.

The Court finds that PPG's antitrust claims are arbitrable under the 1962 License Agreement. It further finds that arbitration under the Agreement's choice-of-forum and choice-of-law provisions will not operate as a prospective waiver of PPG's statutory claims due to Pilkington's express representation and consent to the substantive arbitration of PPG's claims pursuant to U.S. antitrust law. The Court will therefore grant Pilkington's Motion to Stay Proceedings and Compel Arbitration.

Accordingly, IT IS ORDERED that:

(1) Defendants' December 18, 1992 Motion to Dismiss Counts Four and Five is DENIED; and

(2) Defendants' December 18, 1992 Motion to Stay Proceedings and Compel Arbitration is GRANTED.

IT IS FURTHER ORDERED that any damages determination, or arbitral award, made by the arbitrators shall be determined according to U.S. antitrust law irrespective of any conflict that may exist between those laws and the laws of England.

IT IS FURTHER ORDERED that the Court retains jurisdiction over this matter in order to ensure that the arbitration directed by this Order is conducted in accordance with the Order.